[Nos. 35269-9-II; 35792-5-II;    Division Two.    March 31, 2009.]
35799-2-II.

THE STATE OF WASHINGTON, *Respondent*, v. BENJAMIN S. ASAELI
ET AL., *Appellants*.

*Eric J. Nielsen* (of *Nielsen, Broman & Koch, PLLC*); *Sheri L. Arnold*; *Reed Manley Benjamin Speir*; and *Lise Ellner*, for appellants.

*Gerald A. Horne, Prosecuting Attorney*, and *Kathleen Proctor, Deputy*, for respondent.

¶1 Van Deren, C.J. — In this consolidated appeal, Darius Asafo Vaielua and Eroni Joseph Williams appeal their convictions for second degree felony murder based on the assault or attempted assault of the murder victim, Faalata Fola. Their codefendant, Benjamin Salofi Asaeli, appeals his convictions for first degree murder by extreme indifference and first degree assault, both with firearm enhancements.[1] We hold that the evidence was insufficient to support Vaielua's murder conviction and reverse his conviction and remand for an order dismissing with prejudice. We further hold that, although the evidence was sufficient to support Williams's murder conviction, the trial court erred when it admitted gang association evidence and gang expert testimony and that this error unfairly prejudiced Williams. Accordingly, we reverse Williams's conviction and remand for further proceedings. Finally, we hold that (1) although the trial court erred when it admitted the gang association evidence and gang expert testimony, that error was not prejudicial to Asaeli; (2) the trial court did not err when it denied Asaeli's numerous motions to sever; (3) Asaeli waived his right to challenge the trial court's admis-

---

[1] The jury also convicted Asaeli of possession of a stolen firearm and second degree felony murder. Asaeli does not challenge the firearm conviction on appeal. The trial court did not sentence Asaeli on the second degree murder conviction. On appeal, Asaeli does not argue that the trial court should have vacated his second degree murder conviction as having merged with his first degree murder conviction. Nor does Asaeli distinguish between the two murder convictions in his appellate arguments. Therefore, we address only the first degree murder conviction below because the trial court did not sentence Asaeli on the second degree murder conviction.

sion of evidence regarding threatening phone calls received by the victim's sister before the victim's death; (4) the prosecutor did not engage in prejudicial prosecutorial misconduct during closing argument; and, finally, (5) cumulative error does not require reversal. Accordingly, we affirm Asaeli's murder and assault convictions.[2]

## FACTS

### I. OVERVIEW—CHARGES AND PROCEDURAL MATTERS

¶2 In the early morning hours of October 30, 2004, two groups of young people, many of them of Samoan descent, gathered at Thea Foss Park, in the Dock Street area of Tacoma's downtown waterfront. Fola arrived at the park with his cousin, James Fola,[3] in a green Mercury Mystique driven by Tailulu Gago. Breanne Ramaley, Fola's girl friend, arrived separately with friends in her red Nissan. Asaeli drove to the park with his girl friend, Rosette Flores, in her white Chevrolet Lumina. Vaielua arrived in his girl friend's "blueish green" Ford Explorer. VI Williams/Vaielua Report of Proceedings (WRP) at 869. Williams was a passenger in the Explorer.

¶3 Several persons, including Vaielua, asked for Fola[4] by his street name "Blacc." Williams[5] located Fola seated in the driver's seat of the Nissan, which was parked next to Gago's Mercury and near the Lumina driven by Asaeli. Williams challenged Fola to a fight and then moved back. He said

---

[2] After oral argument, Williams and Asaeli moved to amend their appeals to include a claim that their trial counsel were ineffective for failing to ask the trial court to instruct the jury on the lesser included offense of manslaughter. We denied these motions. We note that although Vaielua raised this issue in his opening brief, Williams and Asaeli did not attempt to adopt any of Vaielua's arguments. We do not reach Vaielua's argument on this issue because we reverse and dismiss his conviction for insufficient evidence. ·

[3] To avoid confusion with the murder victim Faalata Fola, we refer to James Fola as James. We intend no disrespect.

[4] Although the record is not entirely clear, it strongly suggests that Fola was of Samoan descent.

[5] The record also suggests that Williams is of Samoan descent.

that Fola had a gun, and he tapped Asaeli.[6] Asaeli immediately stepped forward and fatally shot Fola 7 to 10 times as Fola remained seated in the Nissan. Fola's friend, Tiare-Ann Misionare, was in the back seat of the Nissan at the time of the shooting. Vaielua was not near Williams and Asaeli when the shooting occurred; he was standing with James on the other side of Gago's car. Asaeli later confessed to shooting Fola. But he asserted that he had acted in self-defense after Fola pulled a gun and shot at Williams and then pointed the gun at him.

¶4 The State charged Vaielua,[7] also known as "Skills," and Williams,[8] also known as "Twix," with (1) first degree premeditated murder or, in the alternative, first degree murder by extreme indifference for Fola's death (count I) and (2) second degree felony murder predicated on assault for Fola's death (count III).[9] The State also alleged firearm enhancements on each count.[10]

¶5 The State charged Asaeli with (1) first degree premeditated murder or, in the alternative, first degree murder by extreme indifference for Fola's death (count I); (2) first degree assault of Misionare (count II); (3) second degree felony murder based on the predicate offense of assault for Fola's death (count III); and (4) possession of a stolen firearm (count IV). The State also alleged firearm enhancements on the assault and murder counts.

¶6 The State's trial theory was that Vaielua, Williams, and Asaeli all had ties to Kushmen Blokk, a purported

---

[6] The record clearly establishes that Asaeli is of Samoan descent.

[7] The record also suggests that Vaielua is of Samoan descent.

[8] Williams and Asaeli are cousins.

[9] There is no count II in either Vaielua's or Williams's information or corrected information.

[10] The State also advised Williams that he would be subject to a life sentence without the possibility of parole and that he would be classified as a persistent offender under RCW 9.94A.570 if convicted. The trial court sentenced Williams to life without parole and classified him as a persistent offender; we do not reach Williams's challenge to this sentence because we reverse his conviction and remand for further proceedings.

Blood gang set, and that they planned to confront Fola, who had connections to a Crip gang set from the South Seattle area, about his behavior at the same park a week before the fatal shooting and to either assault or kill him. Although Asaeli admitted that he shot Fola, at trial Vaielua, Williams, and Asaeli all asserted that (1) there was no plan to confront or assault Fola, (2) Williams and Vaielua were not aware Asaeli was armed or willing to shoot Fola; (3) Asaeli acted in self-defense; (4) there was no proof that Kushmen Blokk existed or, if it did exist, that it was a gang; and (5) there was no proof that they were associated with Kushmen Blokk.

¶7 Over repeated objections, the trial court consolidated the cases against all three defendants for trial,[11] denied numerous motions to sever throughout the trial, and ruled that the State could present evidence of gang affiliation and expert testimony on gang culture from Detective John Ringer of the Tacoma Police Department and the Federal Bureau of Investigation Violent Crimes Task Force operating in Pierce County.

¶8 Following several weeks of trial, a jury convicted Vaielua and Williams of second degree felony murder; it did not find that they were armed with a firearm. The jury rejected Asaeli's self-defense claim and convicted him of first degree murder by extreme indifference, second degree felony murder, first degree assault, and possession of a stolen firearm. The jury also found that Asaeli was armed with a firearm when he committed the murder and the assault.

---

[11] Williams was present but not represented at the consolidation hearing. On appeal, he argues that this denied him his right to counsel at a critical stage of the proceedings. Because we reverse Williams's conviction on other grounds, we do not reach this issue. We note, however, that although it is likely that this was not a critical stage of the proceedings, it is better practice for a trial court to hold such hearings only when defendants are represented by counsel.

## II. FACTUAL BACKGROUND[12]

### A. Shooting Incident One Week before Fatal Shooting

¶9 It was common for groups of young Samoans to gather at Tacoma waterfront parks on Friday and Saturday nights after the bars closed. A week before the deadly shooting, several groups of young people had gathered at Thea Foss Park. Those present included Fola, Misionare, Ramaley, James (also known as "Tulo"), Gago (Fola's friend and James's cousin—also known as "Tai" or "Psycho T"), Feleti Asi (also known as "Flex"), Williams, and Asaeli. Fola and Gago fired several rounds from a gun that Fola kept in Ramaley's car.[13] Witnesses, including Asaeli, testified that, at one point, when a car with Asians in it arrived, people at the park threw beer bottles at the car and Fola shot at the Asians' car as it left the park.[14]

### B. Events Immediately Preceding the Fatal Shooting

¶10 A week later, on October 29, 2004, Asaeli, Williams, and Vaielua spent time at Papaya's, a Lakewood bar, playing pool and socializing. Vaielua played pool with his friend, Ishmail Asaeli,[15] who is Asaeli's cousin. Vaielua's uncle, Faleapa, and Vaielua's friends Verdel Malo (also known as "Shake" or "Shaak") and Jeff Niuamoa were also at the bar.

¶11 Between 11:00 and 11:30 PM, Flores and a female friend arrived at the bar; both had been drinking throughout the evening. They were in Flores's friend's car because Asaeli was driving Flores's Lumina that night. According to Flores, Williams arrived at approximately the same time

---

[12] Unless otherwise noted, these facts are taken in the light most favorable to the State for purposes of the sufficiency of evidence analyses.

[13] Fola shot at a sculpture and toward the water.

[14] Nothing in the record suggests that anyone involved in the fatal shooting a week later was in the car that Fola shot at the prior week.

[15] Because Ishmail Asaeli and Benjamin Asaeli share the same last name, we refer to Ishmail by his first name to avoid confusion and intend no disrespect.

they did and Asaeli showed up in Flores's car "an hour or so later." VIII Asaeli/Vaielua/Williams Report of Proceedings (ARP) at 1170. Flores and Asaeli had not planned to meet at the bar that night.

¶12 Around 2:00 AM, most of Papaya's patrons—including Williams, Vaielua, and Asaeli—left the bar. Ishmail testified that Faleapa had already passed out in the Explorer by the time they left. Vaielua talked to some of the others for about five minutes while Ishmail waited by the Explorer. Vaielua then dropped Ishmail off at Vaielua's mother's house near the bar and drove to Thea Foss Park. Ishmail testified that he and Vaielua had never before gone to the waterfront after the bars closed and that he was unaware of any plan to do so that night.

¶13 Although Flores and Asaeli had not arranged to meet at the bar, Flores agreed to ride with him to the park in her car. As Asaeli left the bar, he helped Flores's friend to her own car,[16] and then he said "good bye to everybody that was there."[17] VIII ARP at 1175. Although Flores could not hear what Asaeli said, she saw Asaeli talking to Vaielua before Asaeli returned to Flores's car.

¶14 Flores testified that "[t]here was a whole crowd in the cars" that headed down to the waterfront together, although she was not aware of any specific plan to caravan to the park. VIII ARP at 1176. She and Asaeli both talked on cellular telephones[18] on the way to the waterfront.

¶15 Asi received a telephone call while he and his roommate, Eugene Van Camp, were playing pool at a different pool hall. After the call, Asi asked Van Camp if he wanted to go to the waterfront. Van Camp agreed, they left in Van

---

[16] Asaeli testified that Flores's friend was drunk and upset with someone in the bar, that he got her settled in her car, and that he took a gun away from her so she would not do something stupid. This gun was used to shoot Fola. In contrast to Asaeli's testimony, there was trial evidence that Asaeli stole the gun from one of Flores's friends earlier in 2004.

[17] At trial, Asaeli denied talking to any of the other young men as he left the bar.

[18] Flores did not know to whom Asaeli was talking, what he was saying, or whether Asaeli made or received the calls.

Camp's car, dropped Gloria Moso[19] off at her house, and headed to the waterfront.[20]

¶16 Asi testified that he did not recall seeing Vaielua's vehicle on the way to the waterfront. But Van Camp testified that he and Asi saw the Explorer on the freeway and that Asi told him to get behind the Explorer and to follow it. Van Camp also noted that a white car was following them on the freeway.

## C. Thea Foss Park

¶17 Some time after midnight, Fola, James, and Gago arrived at Thea Foss Park in Gago's car; they were the only people at the park when they arrived. Ramaley; Misionare; Misionare's sister, Tami;[21] and Angeline Paulo, a work acquaintance, arrived in Ramaley's car shortly after 2:00 AM. All had been drinking.

¶18 Fola joined the women and parked Ramaley's car on the passenger side of Gago's car. Fola sat in the driver's seat; Ramaley, Tami, and Paulo walked off, but Misionare remained behind in the back seat. Within 20 minutes of the women's arrival, Vaielua pulled up in the Explorer and parked on the passenger side of Ramaley's car. Then a white Lumina, which appeared to be the same car that had driven through the parking lot and left a short time earlier, and a green Volkswagen Jetta backed in near the Explorer. Asi and Van Camp were in the Jetta and Flores and Asaeli were in the Lumina.

¶19 Misionare testified that, from her vantage point in the backseat of Ramaley's car, she saw five men in the Explorer. They got out of the Explorer and the driver "[s]tarted motioning to the people he brought" as he stood in front of Ramaley's car. V ARP at 636. She estimated that

---

[19] Moso is related to Asaeli.

[20] Van Camp also testified that they took Moso home after, rather than before, going to the waterfront.

[21] Because Tiare-Ann Misionare and Tami Misionare share the same last name, we refer to Tami by her first name to avoid confusion and intend no disrespect.

the driver motioned to the other men for at least five minutes. Then the men from the Explorer approached James and Gago, who were standing in front of Gago's car. Gago saw two of the people from the Explorer approach the white Lumina and speak to the occupants.

¶20 James recognized Vaielua as the Explorer's driver; he knew Vaielua as "Skills" and had met him a couple of times in the months before this incident. Soon after the other cars arrived, Vaielua, who was waving a red or "lighter color" bandana, approached James. IX ARP at 1369. After they exchanged greetings, Vaielua asked James where "Blacc" was. James also heard others asking for "Blacc," and he recognized Williams and Malo.

¶21 Two of the men from the Explorer covered their faces with brown bandanas; one of these men approached Gago and asked for "Blacc." Gago later testified that the brown flags indicated to him that the people with the flags were related to " 'K' Blokk" or "Kushmen Blokk." III WRP at 296. Gago, however, was not concerned when the men started asking for Fola because Gago and his friends had been "kicking" with some people with brown "flags on" a week before without incident. III WRP at 299. Gago was not sure that these men were the same people he had been with before.

¶22 Ramaley later testified that she was worried when she saw all the people get out of the Explorer because she was aware that Fola had recently received some threatening phone calls.[22] But Fola did not appear concerned when the other men arrived.

¶23 After Vaielua approached James, James saw Williams, Malo, and a third man wearing a black "hoodie" approach Ramaley's car and start talking to Fola, who was still in the driver's seat. Then James "heard a little ruckus," which sounded like an argument, and then heard someone

---

[22] Fola's sister also testified about threatening calls Fola received before his death. That testimony, admitted over defense objections, is described in greater detail below.

say to Fola, " '[D]o you want to go heads,' " a phrase James took to mean that someone wanted to fight Fola one-on-one without weapons. III ARP at 314. When James heard this, he and Gago started to walk toward the back of Gago's car to see what was going on. He heard several gunshots; he could not tell exactly where the shots originated but he knew someone was shooting at Fola.

¶24 Just before the shooting, Misionare, who was still in the car with Fola, saw Williams approach Fola and say to him, "[T]his be Twix . . . let's go heads-up," which she interpreted as an invitation to fight. V ARP at 639. Fola then leaned over, reaching first for something under the seat, and then for the glove box. Fola mumbled something that Misionare could not understand. Misionare testified that "[w]hen [Fola] leaned over to reach for the glove compartment I heard [Williams] jump back and tap[ ] the guy behind him and sa[y] '[T]his nigga got a gun' " to the person behind him.[23] V ARP at 650. Gunfire erupted.

¶25 Misionare saw one or two bullets come through the car's windshield and estimated that four "shots" were fired, although she also stated that it appeared that "multiple bullets were being fired out of one shot." V ARP at 650. In addition to seeing the bullets come through the windshield, she heard several more shots and she believed the later shots were coming in through the driver's side window. Believing that she was in the line of fire, she lay down on her back on the back seat after the first shot. As she lay there, she could see Fola; it seemed as if the shooter shot at Fola every time Fola tried to move.

¶26 Immediately after the shooting, Misionare heard someone say "K," which she understood to be a reference to Kushmen Blokk. V ARP at 726. She did not know who said this and she admitted that she could have heard only part of what the person was saying. Although there was evidence of a gun in Ramaley's car that night, Misionare denied seeing a gun in Fola's hand when Asaeli shot him.

---

[23] At trial, Misionare testified that she did not see Williams tap the person behind him but that she "heard" the tap. V ARP at 650.

¶27 Gago testified that, after he heard the first gunshots, he saw the man with the brown bandana over his face who had approached him and asked for Fola lean into the car through the driver's window with his left hand on the car and shoot Fola as Fola remained seated in the driver's seat. Gago then saw the man shoot through the front windshield. James testified that the occupants of the Explorer, the Jetta, and the Lumina drove away immediately after the shooting.

¶28 Fola was able to move to Gago's car and Gago drove Fola and James to a nearby hospital. Ramaley, Misionare, Tami, and Paulo followed in Ramaley's car. Fola suffered 10 gunshot wounds caused by 7 to 10 bullets and died from these wounds while in surgery.

## D.   Police Investigation and Witness Interviews

¶29 Police seized Ramaley's car at the hospital. They found two bullet holes in the front windshield and two spent 9 mm bullets inside the car that were the same brand as the bullets found in Fola's body. In addition, they found Asaeli's palm print on the left front window of the car slightly behind the front wheel well.

¶30 Police arrested Asaeli at his house on the day of the shooting. During a consensual search of his bedroom, the police found "a [H]i[-Point] semi-automatic pistol" hidden in his clothes hamper and a shoe box containing 9 mm ammunition in his closet. IV ARP at 457. They did not find any bandanas or other gang related clothing during the search. Asaeli later admitted that he shot Fola, but he asserted that he did so in self-defense.

¶31 Officers interviewed James, Tami, Misionare, and Ramaley at the hospital. They later interviewed Asi, Van Camp, Misionare, and Gago. Defense counsel and the State also interviewed several witnesses, including James, Misionare, and Asaeli's friend from church, Kristy Devault.

¶32 In statements to counsel, Devault stated that she had spoken to Asaeli after the fatal shooting and that he

told her (1) Fola was causing problems and " 'one of the boys' " attempted to intervene and warn him this was not how things were done in Tacoma and (2) Fola had been trying to start problems with an Asian gang in Tacoma. X WRP at 1570. He told her that, when Fola was confronted, things escalated, Fola started to shoot, " 'the boys began to run away, and someone fired back in self-defense.' " X WRP at 1572. He also told her that the physical description of the shooter did not match him.

¶33 At trial, Asaeli denied telling Devault about the incident or telling her anything about Fola. The State called Devault as a rebuttal witness. The trial court admitted Devault's testimony confirming some of the statements she had attributed to Asaeli in her statements to counsel over a variety of defense objections. Although the trial court admitted her testimony as substantive evidence against Asaeli, it limited her testimony to impeachment purposes as to Williams and Vaielua.

III. Trial

A. Witness Testimony

¶34 Throughout trial, the witnesses' testimony frequently contradicted their prior statements and several of the witnesses claimed that they could not recall numerous facts. Accordingly, portions of their prior statements were used to refresh their memories, admitted for impeachment purposes, or admitted as substantive evidence.

B. Gang Evidence

1. Jail Cell Graffiti

¶35 Tacoma Police Detective Kurt Werner testified that on August 9, 2005, he was shown what appeared to be gang related graffiti in Williams's jail cell. Over Williams's objection, the trial court admitted several photographs of the graffiti in the cell. The photographs showed the phrases "Loco Boy," "Kushmen Blokk 73rd," "Brown Flag Gangsta,"

"ESOLBZ," and the name "Twix," carved into the door, door frame, and window frame. Ex. 158. The graffiti on the window frame that said "Twix," "South West KUSHMEN BLOKK 73rd," "Brown Flag Gangsta," and "Tacoma's Finest '253,'" all appeared to be in the same or a similar hand. Ex. 153. Werner admitted that he did not know who created the graffiti and that he had no idea if it had been there before Williams was put in the cell.

¶36 Vaielua moved in limine to exclude the graffiti evidence, asserting that the State wanted to admit it as evidence of his gang affiliation. Vaielua argued that the evidence was not admissible against him because there was no evidence that he "creat[ed] the artwork" and it was unlikely Williams would take the stand so Vaielua could not confront Williams about it.[24] Vaielua Clerk's Papers (VCP) at 224. Vaielua also asserted that, because he could not confront Williams, the evidence was unfairly prejudicial. In the alternative, Vaielua argued that, if the trial court admitted this evidence, he was entitled to a limiting instruction directing the jury that this evidence applied only to Williams. The State agreed to a limiting instruction. In response, Vaielua and Asaeli argued that trial severance was appropriate if the trial court refused to suppress the graffiti evidence, arguing that it was the only way to prevent its prejudice to them and that it would not be admissible against them.

¶37 The trial court denied the motions to sever, stating that the parties could address this issue again as the case developed. The trial court instructed the jury that it could consider the jail cell graffiti evidence only against Williams.

### 2. Fence Graffiti

¶38 During Ringer's testimony on gang culture, which we describe in more detail below, the State presented

---

[24] Although the parties discussed at trial whether this evidence was admissible under *Bruton v. United States*, 391 U.S. 123, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968), the appellants do not raise any *Bruton* issues related to this evidence on appeal.

photographs of graffiti similar to that found in Williams's cell. Ringer found the graffiti on May 25, 2006, on a fence in the area of 73rd Street and South Cushman Avenue. Vaielua, Williams, and Asaeli moved to suppress these photographs, arguing that the State failed to provide any information about when the graffiti was made, who made it, or how it was relevant to the case. The trial court denied the motion, admitted the photographs of the fence graffiti, and allowed Ringer to testify about it.

### 3. Other Gang Evidence

¶39 Several witnesses provided testimony bolstering the State's theory that this was a gang shooting. This included testimony that (1) Fola and James were or had been members of the Crips sets or cliques named the "Everybody killer," or "EBK," and the "Connect Gang," X ARP at 1547; (2) the Crips were a street gang whose members wore blue; (3) James believed that both Williams and Vaielua were involved with or members of a "group" called "K-Block" or "Kushman Blok,"[25] II ARP at 271; (4) James and Gago considered Kushmen Blokk to be a "gang" or "click" that identified itself with the color brown, II ARP at 272; (5) Misionare believed that the shooting was possibly gang related because she heard someone yell " 'K' " after the shooting and that this reference to " 'K' " " 'stands for Kushmen Blok, a Samoan group of hard-core gangsters,' " V ARP at 726; (6) Asi indicated that Williams, Vaielua, and, possibly, Asaeli were associated with Kushmen Blokk; (7) several witnesses stated that some of the people involved in the shooting were wearing or waving brown bandanas; and (8) Van Camp told officers that some of the individuals present the night of the shooting identified themselves as

---

[25] The alleged gang name is spelled variously in the record as "K-Block," "Kushman Blok," and "Kushman Blokk." We refer to it as it appears in the record each time.

Kushmen Blokk members but he asserted that the group did not call itself a gang.[26]

### C. Expert Testimony on Gangs and Gang Culture

¶40 After Fola's death, the police department put out a request for information about Kushmen Blokk but it did not receive any additional information. Over defense objections and after an extensive offer of proof, the trial court allowed Ringer to testify at length as a gang and gang culture expert. To prepare for his testimony, Ringer reviewed some reports and witness statements from a 1999 shooting investigation involving Kushmen Blokk. In 2006, 19 months after this shooting, he located the fence graffiti in the area of 73rd Street and South Cushman in Tacoma referring to Kushmen Blokk.[27] Ringer stated that, other than the 1999 report and the graffiti evidence in this case, he knew nothing about Kushmen Blokk operating as a gang in the Tacoma area and had no information connecting Vaielua, Williams, or Asaeli to gang activity.[28] Thus, the only indications that Kushmen Blokk had any "criminal purpose" were the 1999 incident and the current incident, which Ringer indicated showed that the group engaged in acts of violence. V WRP at 705.

¶41 Ringer also provided the jury with his working definition of a "gang":

---

[26] Although James stated that EBK was a Crip set and that the Crips are a gang, he also testified that EBK was "just a family group," or just a clique or "a thing [his] family started," a group of people that just hung out together and that you did not have to fight, shoot, or kill your way in. When the State asked him whether the group did anything illegal, he responded, "Not really." III ARP at 390. Tami also asserted that the group Fola belonged to was just a group of people from the same apartment complex who sat around singing and drinking. Additionally, when James testified that Kushmen Blokk was a "gang" or "click," he also asserted that a "gang" was "[a] group of people growing up together," "[w]ith a color," and that a " 'click' " was the same thing as a gang. II ARP at 272. Similarly, Gago asserted that a gang clique was "like, a whole bunch of homeys from the same block." III WRP at 297.

[27] Asaeli, Williams, and Vaielua renewed their objections to the photographs of the fence graffiti and the trial court admitted the evidence based on its prior rulings.

[28] Ringer also testified that it was not unusual for gangs to avoid police attention "until things happen." V WRP at 699.

It's very tough to put an absolute definition on what a gang is for law enforcement because it's not a real structured organization much like the police department or a business. A gang tends to be a loose knit group of individuals, male primarily, who associate together and agree to work together under -- usually under a common definition of -- it's got a title for the common purpose of either criminal activity, protection, solidifying the neighborhood. It's tough to put a hard and fast definition because the structure of the gang is not hierarchical. It's horizontal. There's no -- usually no president, vice president. It's made up of a lot of equals who some have more stature than others, but there's not an absolute leader generally.

V WRP at 660-61.

¶42 He testified that gang "sets" are subgroups of the primary gangs, such as the Bloods and Crips; that they are usually associated with different geographic areas; and that "cliques" are subdivisions of sets. V WRP at 661. "Set" and "clique" identifiers are generally more specific indicators of where a group comes from. V WRP at 662. Gang cliques form for many reasons, ranging from large scale and well organized drug trafficking to merely providing a specific group a way of protecting its members from others or as a way of providing an "instant family" if the group members' family associations are otherwise lacking, and gang behaviors differ significantly between gangs. V WRP at 752.

¶43 Over defense objections, Ringer stated that, when he executed search warrants on gang members, he found guns present "in excess of 60 percent of the time." V WRP at 758. He noted that the Federal Bureau of Investigation's Violent Crimes Task Force operating in Pierce County often used firearm offenses to target gang members, commenting that the gang members are often felons, so law enforcement can go after them for illegal possession of firearms. At one point, Ringer stated, "Gangs and firearms are synonymous." V WRP at 759. He also testified that "[f]irearms go hand in hand with gangs" and due to the nature of gangs—the

constant threat they are under from other gangs—"when you see gangs, you see firearms." V WRP at 758. The trial court struck his references to gang members as felons but denied a defense motion for mistrial based on this generalized testimony.

¶44 Ringer also recited the history of the Crips and the Bloods, describing their initial formation in rival Los Angeles high schools during the late 1960s and early 1970s, and stating that these groups were inclined to engage in criminal activity. He elaborated that the Bloods are sometimes known as the Pirus.[29] He described how the Bloods and Crips moved into the Tacoma area and how the Crips successfully pushed the Bloods out of Tacoma's Hilltop area into Tacoma's East Side.

¶45 Ringer testified that (1) the Bloods and Crips were associated with Tacoma gangs; (2) a gang's primary goals are to protect or control the criminal activity in a neighborhood; (3) neighborhood graffiti indicates which gang operates in a neighborhood; (4) gangs adopt certain colors and will sometimes wear bandanas of that color to indicate their gang association—Bloods wearing red and Crips wearing blue—and that displaying rival gang colors in another gang's territory would be a sign of disrespect that could incite violence; and (5) when spelling a word, gangs will often attempt to avoid using the letters in the name of a gang rival; for example, Bloods will substitute the letter C with the letter K when spelling a word containing a C.

¶46 Ringer also testified about gang graffiti, saying that although he had learned to interpret some graffiti, he often resorted to informants to interpret it. Graffiti can indicate what gang is operating in a specific neighborhood, the street names of some of the individuals in the gang, who the gang's rivals might be, and "a lot of what they're into." V WRP at 671. He elaborated that the heavy use of the letter B and avoidance of or crossing out of the letter C in graffiti

---

[29] Ringer explained that someone who lived on Piru Street "formed the Pirus Gang, which is another form of Bloods." IV WRP at 526.

could indicate Blood affiliations but if words contained the letter C and the C's were not crossed out, the graffiti indicated Crip affiliation. Apart from the jail cell graffiti including the word "Twix" and the presence of the graffiti in Williams's cell, which arguably connected that graffiti to Williams, none of the witnesses in this case tied any of the graffiti evidence to Asaeli, Williams, or Vaielua.

¶47 Ringer also provided the jury with the following definition of a "wannabe":

> Wannabe in the gang culture is somebody who wants to be a gang member, somebody who hangs around gangs, wants to become a gang member, may emulate them. Generally, there's a negative connotation put on that person; oh, he's just a wannabe; but there are those who progress on to become gang members. Again, they emulate the gang members. They idolize them.

V WRP at 757. He further testified that although early gang members were open about their gang associations, over time they learned to deny their gang associations to avoid repercussions even though they were quite proud of those associations.

¶48 With regard to photographs of Williams's jail cell graffiti, Ringer testified that the spelling of Cushman with a K, rather than a C, indicated that Kushmen Blokk was a Blood gang set. He further testified that the use of "73" in the graffiti is what prompted him to look for additional graffiti in the area of 73rd and Cushman. V WRP at 685. He noted that the Ks in both the fence and jail graffiti were similar and that the placement of the word "Twix" immediately above "Kushmen Blokk 73" and in other locations in the jail cell graffiti indicated to him that the author of at least some of the graffiti was someone with the street name "Twix." V WRP at 687.

¶49 He continued that the other phrase in Williams's jail cell graffiti, "ESOLBZ," was a reference to a Blood set called the "East Side Original Loco Boyz" and the phrase "ESP" immediately below that referred to "East Side Pirus." V

WRP at 687-88. He acknowledged that he did not have any direct evidence of who had created the jail cell graffiti or how old it was. He testified that the 2006 fence graffiti also indicated Blood activity in that area and that there was no Crip activity in the same area.

¶50 In response to the State's objection, the trial court precluded Vaielua from questioning Ringer during cross-examination in depth about the cultural aspects of gangs, ruling that, because Ringer's testimony had not been that specific, this line of questioning was outside the scope of direct. But Ringer admitted that he had no Samoan informants; that he had never testified about any Samoan gangs; that although he had some general knowledge of Samoan culture, he was not an expert in Samoan culture; and that he obtained his knowledge of Samoan culture and gangs through reading unspecified materials and by working with victims or suspects within the Samoan community. His informants were not Samoan and his informants did not know about Kushmen Blokk's reputation because most of them were Crips and, therefore, unlikely to have information on gang activities on Tacoma's East Side where Blood groups were more active.

¶51 Ringer commented that popular culture sometimes overlaps with gang culture and that this can make determining whether a group is a true gang difficult. He further acknowledged that most of his experience with gangs related to predominately African-American gangs and that, to some extent, you had to be familiar with the specific cultures the gangs came from to fully understand them.

¶52 Ringer agreed that he would not assume gang affiliation merely because someone went around carrying a red bandana and using K instead of C, stating that there would "have to be more than that." V WRP at 696. To identify gang members, he would look at their use of colors, their clothing, whether they had any gang related tattoos, their use of gang "signs"—"specific hand gestures associated with that gang"—and other factors; he did not have any information about whether Asaeli exhibited any of these factors. V WRP

at 741-42. He was not aware of the specific requirements for belonging to Kushmen Blokk and stated that the requirements for joining gangs and indications of membership varied from gang to gang. But he commented that joining a gang often, but not always, involved engaging in fights, taking a severe beating from other members, or shedding blood.

## ANALYSIS

### I.  SUFFICIENCY OF THE EVIDENCE: VAIELUA AND WILLIAMS

¶53  We first address whether the evidence was sufficient to support Vaielua's and Williams's second degree felony murder convictions.[30] We hold that the evidence as a whole does not support Vaielua's conviction but that it was sufficient to support Williams's conviction.

### A.  Standard of Review

¶54  When reviewing sufficiency issues, we view the evidence in the light most favorable to the State to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *State v. Joy*, 121 Wn.2d 333, 338, 851 P.2d 654 (1993). "A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). "In determining the sufficiency of the evidence, circumstantial evidence is not to be considered any less reliable than direct evidence." *State v. Delmarter*, 94 Wn.2d 634, 638, 618 P.2d 99 (1980). And we defer to the trier of fact on any issue that involves "conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence." *State v. Thomas*, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004).

---

[30] Asaeli does not argue that the evidence was insufficient to support his convictions.

B.  Vaielua

¶55 Vaielua contends that the evidence was insufficient to support his conviction, arguing, inter alia, that there was no evidence he knew of or participated in any plan to assault or shoot Fola and that all the evidence established only his mere presence at the scene. We agree.

¶56 To prove Vaielua was an accomplice to Fola's murder, the State had to prove beyond a reasonable doubt that Vaielua (1) knew his actions would promote or facilitate this crime, (2) was present and ready to assist in some manner, and (3) was not merely present at the scene with some knowledge of potential criminal activity. RCW 9A.08.020(3). Taking the evidence in the light most favorable to the State, we conclude that, although there was evidence that Vaielua was present at the park, that he drove Williams and others to the park, and that he was aware that some members of the group he was with were trying to locate Fola, the evidence failed to show that Vaielua was present at the scene with more than mere knowledge of some potential interaction with Fola.

¶57 The trial testimony showed that (1) Asaeli, Asi, and Williams witnessed Fola shoot at a car with Asian men in it at Thea Foss Park a week before Asaeli shot Fola but that Vaielua was not present at the time; (2) a week later, Vaielua was at Papaya's bar at the same time as Williams and Asaeli; (3) Vaielua spoke to Williams and Asaeli either at the bar or as they were all leaving the bar at closing time; (4) Asaeli did not ask Flores if she wanted to go to the waterfront until after speaking to the others as they were leaving the bar; (5) Vaielua did not normally go to the waterfront after the bars closed when he was with Ishmail; (6) after leaving the bar, talking to the others, and dropping Ishmail off, Vaielua drove the Explorer to Thea Foss Park at the same time Asaeli, Van Camp, and Asi drove to the park; (7) the three cars arrived at approximately the same time; (8) when Vaielua arrived, he had four passengers with him, including Williams; (9) before the shooting, Vaielua and the

others exited the Explorer and Vaielua spoke and motioned to the people in the Explorer for several minutes; (10) also before the shooting, some of those who arrived with Vaielua spoke to Asaeli; (11) immediately before the shooting, Vaielua approached James, whom he knew from prior peaceful encounters; and (12) after greeting James, Vaielua asked where "Blacc" was and then stood with James (with a car between them and Ramaley's car) until the shooting.[31] Importantly, the evidence did not show what was said during any conversations Vaielua may have had or overheard that evening nor was there any evidence that any of these conversations related in any way to a plan to shoot or assault Fola.

¶58 At best, this evidence is sufficient to suggest that Vaielua and the others agreed to meet at the park after the bar closed and that Vaielua may have known that someone from his group was trying to locate Fola. But the record contains no evidence, direct or indirect, establishing that Vaielua was aware of any plan, by Asaeli, Williams, or anyone else, to assault or shoot Fola.

¶59 The law is well settled that mere presence is not sufficient to prove complicity in a crime. *State v. Roberts*, 80 Wn. App. 342, 355-56, 908 P.2d 892 (1996). Accordingly, there was insufficient evidence to prove

---

[31] There was also evidence that Vaielua may have shared an affiliation with his friends, that Vaielua and his friends may have displayed several gang colors when they arrived, and that someone shouted out "K" after the shooting. Although this is evidence that Vaielua and the others may have been acting in concert and may relate to motive, this evidence, even taken in the light most favorable to the State, does not demonstrate that Vaielua was aware that the group was planning to do more than locate Fola; it does not demonstrate that Vaielua was aware of a plan to assault or kill Fola. We note that, although some of Devault's testimony suggested the group had intended to confront Fola about the prior week's shooting, that evidence was admitted as substantive evidence against Asaeli only.

Furthermore, as we discuss below, the trial court improperly admitted the gang association and gang expert evidence. Given the lack of evidence demonstrating that Vaielua was aware of any plan to assault or shoot Fola, the relative lack of any direct evidence that Vaielua was involved in any gang activities other than his waving a red or "lighter color" bandana when he approached James in the park, and the highly prejudicial nature of gang evidence in general, we would reverse Vaielua's conviction even if we were to find the evidence sufficient to support his conviction, although we would remand for further proceedings rather than dismiss the charge. IX ARP at 1369.

Vaielua's complicity in the shooting. His mere presence at the scene with knowledge that others were looking for Fola is not sufficient to support this conviction.

¶60 Thus, we hold that the evidence was insufficient to support Vaielua's second degree felony murder conviction. We reverse the conviction and remand to the trial court for an order dismissing the charge against him with prejudice. Because we reverse and dismiss for insufficient evidence, we do not reach Vaielua's additional arguments.

## C. Williams

¶61 Williams raises three arguments in contending that the evidence was insufficient to support his conviction. We disagree with all three.

### 1. Evidence of Assault

¶62 Williams first argues that the evidence failed to show that an assault occurred. The record does not support this contention.

¶63 Instruction 40 provided:

> A person commits the crime of murder in the second degree as alleged in [the second degree felony murder count] when he or she commits *or attempts to commit* assault in the first or second degree and in the course of and in furtherance of such crime or in immediate flight from such crime he or she or an accomplice causes the death of a person other than one of the participants unless the killing is justifiable.

Asaeli Clerk's Papers (ACP) at 92 (emphasis added). And instruction 29 provided:

> An assault is an intentional touching or striking or shooting of another person, with unlawful force, that is harmful or offensive regardless of whether any physical injury is done to the person. A touching or striking or shooting is offensive if the touching or striking or shooting would offend an ordinary person who is not unduly sensitive.
>
> An assault is also an act, with unlawful force, done with intent to inflict bodily injury upon another, tending but failing

to accomplish it and accompanied with the apparent present ability to inflict the bodily injury if not prevented. It is not necessary that bodily injury be inflicted.

An assault is also an act, with unlawful force, done with the intent to create in another apprehension and fear of bodily injury, and which in fact creates in another a reasonable apprehension and imminent fear of bodily injury even though the actor did not actually intend to inflict bodily injury.

ACP at 81.

¶64 The evidence, taken in the light most favorable to the State, shows that when Williams, Asaeli, and the third man approached Fola, they did so in a group and that some of them covered their faces, hiding their features. It also showed that when Fola reacted to Williams's invitation to fight, Williams turned and tapped Asaeli, who then shot Fola. Although the evidence shows that Williams may have individually challenged Fola to a fight, it also shows that he did so under circumstances that would have allowed the jury to conclude that Williams and the group that approached Fola intended to confront Fola together, whether Fola wanted to fight or not, and that they came prepared either to put Fola in fear of harm or to actually harm him, specifically by having numerous people surround Fola as he sat, vulnerable, in Ramaley's car.

¶65 These facts are sufficient to allow a reasonable jury to conclude that Williams intended to intentionally touch or strike Fola, or place him in reasonable apprehension of bodily injury, in a manner that would offend an ordinary person. Thus, the evidence was sufficient to allow the jury to conclude, at the very least, that Williams and the others who approached Fola *attempted* to assault Fola. Because instruction 40 allowed the jury to convict Williams of felony murder if he assaulted or *attempted* to assault Fola, the evidence was sufficient to support his conviction.

2. Williams Acted in the Course of and in the Furtherance of or in Immediate Flight from an Assault

¶66 Williams next contends that, even if the evidence was sufficient to establish an assault, the evidence was

insufficient to establish that Asaeli shot Fola in the course of or in furtherance of or in immediate flight from the assault because the assault was complete before Asaeli shot Fola. Williams asserts that the assault was complete once he invited Fola to fight and that he was not attempting to flee from the scene of the assault when Asaeli shot Fola.

¶67 Williams's characterization of the assault as complete once he challenged Fola to fight is unreasonably narrow. Contrary to Williams's assertions, the evidence was sufficient to allow a jury to conclude that Williams's challenge to Fola was the initial step in an attempted assault and that, as noted above, Williams and the group that approached Fola intended to act in concert to ensure that they could confront Fola. Furthermore, taken in the light most favorable to the State, the evidence was sufficient to allow the jury to find that Asaeli was standing ready to assist Williams; that Williams knew Asaeli was armed because Asaeli positioned himself near Williams in a way that allowed him access to Fola;[32] that Williams turned to Asaeli and signaled to him with a tap when the situation escalated; and that, in response to Williams's tap, Asaeli immediately stepped in and shot Fola. The evidence was sufficient to allow the jury to conclude that the assault or attempted assault encompassed the entire incident, not just Williams's initial verbal challenge to Fola, and that the shooting occurred during the course of the assault or attempted assault. Accordingly, Williams's argument fails.

### 3. Knowledge Asaeli Was Armed and Accomplice Liability

¶68 Williams also argues there was no evidence that he knew Asaeli was armed and was going to shoot Fola or that he and Asaeli were acting in concert. Again, we disagree.

---

[32] The evidence showed that Asaeli stood immediately behind Williams and that he was close enough to Williams that Williams could touch him. It also showed that when Williams commented that Fola was armed he "tapped" Asaeli. V ARP at 650. A reasonable jury could infer from this evidence that Williams knew Asaeli was available to defend him if Williams believed that Fola was armed.

██ ¶69 Taken in the light most favorable to the State, the evidence shows that (1) Williams and Asaeli spoke at the bar before going to the park, (2) they arrived simultaneously at the park, (3) several members of the group with whom they arrived called out asking for Fola, (4) two of their group covered their faces, (5) Asaeli approached Fola with Williams and positioned himself close by, (6) Williams intentionally signaled to Asaeli when the situation escalated, and (7) Asaeli immediately stepped forward and shot Fola. This circumstantial evidence was sufficient to allow the jury to conclude that Williams knew Asaeli was there to provide assistance, including that he was armed and prepared to shoot Fola if necessary, even though there was no direct evidence that Williams was aware Asaeli was armed and prepared to shoot Fola.

¶70 In sum, we hold that the evidence was sufficient to support Williams's conviction for second degree felony murder based on the assault of Fola.

## II. ADMISSION OF GANG ASSOCIATION EVIDENCE AND EXPERT TESTIMONY ABOUT GANGS

¶71 Williams and Asaeli[33] also argue that the trial court abused its discretion in admitting general gang evidence and Ringer's expert testimony. We agree. We hold that these errors were prejudicial to Williams but not to Asaeli.

██ ¶72 We review a trial court's evidentiary rulings for abuse of discretion. *State v. Finch*, 137 Wn.2d 792, 810, 975 P.2d 967 (1999). A trial court abuses its discretion when its evidentiary ruling is " 'manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons.' " *State v. Downing*, 151 Wn.2d 265, 272, 87 P.3d 1169 (2004) (quoting *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971)). The burden is on the appellant to prove abuse of discretion. *State v. Wade*, 138 Wn.2d 460, 464, 979 P.2d 850 (1999).

---

[33] Vaielua also argues that the trial court abused its discretion in admitting gang evidence. But because we reverse Vaielua's conviction based on insufficient evidence, we do not include his argument throughout this section.

## A. Gang Association Evidence

¶73 Williams and Asaeli contend that the gang association evidence was irrelevant, unfairly prejudicial, propensity evidence inadmissible under ER 404(b). Specifically, they assert that any gang association evidence was inadmissible because the State produced' no evidence that (1) connected Fola's murder to gang activity; (2) Kushmen Blokk was a gang; (3) Vaielua, Williams, or Asaeli were directly involved in a gang; and (4) Asaeli was attempting to heighten his gang status by shooting Fola.

### 1. Related Facts

¶74 Before trial, the State moved to admit a variety of gang association evidence. The State asserted that the shooting was a retaliatory act by members of Kushmen Blokk against Fola for his behavior at the park the week before his death and argued that the proposed gang association evidence and expert testimony on gangs were relevant to the issues of premeditation, intent, and motive, as well as to disprove Asaeli's self-defense claim. The State asked the trial court to admit (1) the evidence of "street gang relationships among the defendants and the victims where the motive for the killing was retaliation for disrespect displayed by the victim toward the defendant's gang set" and (2) expert testimony regarding "street gangs" to "assist the jury in determining the motive for the shooting and thereby the premeditation and intent of the defendants." VCP at 151.

¶75 The State contended that the evidence of Vaielua's, Williams's, and Asaeli's gang associations included evidence that (1) some of the people present during the incident were flying flags and displayed gang colors; (2) some of the "victim's associates" knew Vaielua as a member of Kushmen Blokk and referred to him by his street name; (3) Williams referred to himself by his street name when he challenged Fola to fight; and (4) Vaielua, Williams, Asaeli, and their friends arrived as a group and appeared to

act as a group to locate and confront Fola. I ARP at 52. The State noted that Flores stated that Williams and Vaielua were members of "the Kushman Blok and that they frequent the area of 72nd & Cushman," and that other evidence demonstrated Asaeli "associate[d]" himself with the gang that night. I ARP at 54, 63.

¶76 In support of its motion to introduce gang evidence, the State attached numerous police reports from the murder investigation. In those reports, various witnesses stated that (1) Kushmen Blokk was a gang or that some in the Samoan community considered Kushmen Blokk a gang; (2) Kushmen Blokk's color was brown; (3) some of the people who arrived at the park immediately before the shooting had covered their faces with red, brown, or blue "rag[s]" and one was waiving a red bandana, VCP at 44; (4) they had heard someone yell "K," which they took to mean Kushmen Blokk, immediately after the shooting, VCP at 75; (5) Fola was a Crip; (6) Fola had been shot because he had insulted Kushmen Blokk on a Samoan chat line, the "donut," had threatened to "light up" the Kushmen Blokk, and had shot at a group of Asian males a week earlier, VCP at 34; and (7) Asaeli was either a Kushmen Blokk wannabe with "the K block gang" or his cousins were in a gang and he was related to them. VCP at 66, 57. The State also attached reports from a 1999 shooting incident involving a group identified as the "Kushman Block Blood gang." VCP at 143. The State later submitted a supplemental exhibit that included photographs of the graffiti from Williams's jail cell.

¶77 Vaielua, Williams, and Asaeli argued that any gang evidence was inadmissible because there was no evidence that they were gang members or that Kushmen Blokk, assuming it existed, was a gang. They further argued that the gang evidence was inadmissible propensity evidence intended to imply that Samoans living in the Cushman Street area were criminals and were guilty merely by association.

¶78 The trial court commented that gangs have been around throughout human history and that, although they

often were "composed primarily of a specific ethnic group," this did not mean they were "cultural association[s] or protected under the constitution." I ARP at 81. The trial court ruled, "[B]ased on the evidence that is in front of me[,] I think that the [S]tate has carried its burden and the gang evidence will come in." I ARP at 82.

## 2. ER 404(b)

¶79

ER 404(b) prohibits a court from admitting "[e]vidence of other crimes, wrongs, or acts . . . to prove the character of a person in order to show action in conformity therewith." This prohibition encompasses not only prior bad acts and unpopular behavior but *any* evidence offered to "show the character of a person to prove the person acted in conformity" with that character at the time of a crime.

*State v. Foxhoven*, 161 Wn.2d 168, 174-75, 163 P.3d 786 (2007) (alterations in original) (quoting *State v. Everybodytalksabout*, 145 Wn.2d 456, 466, 39 P.3d 294 (2002)). But a trial court may admit such evidence for other purposes "such as proof of motive, plan, or identity." *Foxhoven*, 161 Wn.2d at 175.

¶80 Before admitting evidence under an exception to ER 404(b), "the trial court must (1) find by a preponderance of the evidence that the misconduct occurred, (2) identify the purpose for which the evidence is sought to be introduced, (3) determine whether the evidence is relevant to prove an element of the crime charged, and (4) weigh the probative value of the evidence against its prejudicial effect."[34] *State v. Pirtle*, 127 Wn.2d 628, 648-49, 904 P.2d 245 (1995). "Preponderance of the evidence means that

---

[34] The trial court must conduct the above analysis on the record. *Foxhoven*, 161 Wn.2d at 175. But if the record shows that the trial court adopted one of the parties' express arguments as to the purpose of the evidence and that party's weighing of probative and prejudicial value, then the trial court's failure to conduct its full analysis on the record is not reversible error. *State v. Pirtle*, 127 Wn.2d 628, 650-51, 904 P.2d 245 (1995). As the defendants note, the trial court did not conduct a complete ER 404(b) analysis on the record. The record shows, however, that the trial court adopted the State's arguments. Accordingly, although

considering all the evidence, the proposition asserted must be more probably true than not." *State v. Ginn*, 128 Wn. App. 872, 878, 117 P.3d 1155 (2005).[35]

### 3. Evidence of Misconduct

¶81 Williams and Asaeli contend that the trial court erred when it admitted the gang association evidence. Because we agree that the State failed to establish by a preponderance of the evidence that Kushmen Blokk was a gang, we hold that the trial court erred when it held that gang association evidence was admissible.

¶82 First, the statements indicating that some witnesses believed Kushmen Blokk was a gang were conclusory and did not explain the basis of that belief, the basis of their knowledge, or what they meant when they referred to the group as a "gang." Second, although the information related to the 1999 incident suggested that there may have been a gang called the Kushmen Blokk Bloods in 1999 and that the group engaged in a retaliatory shooting, (1) the 1999 incident occurred five years before the current incident and did not involve Vaielua, Williams, or Asaeli or anyone else present when Asaeli shot Fola; (2) the State presented no evidence that the group involved in the 1999 incident engaged in any gang related activity before or after the 1999 incident; and (3) there was no evidence that the Kushmen Blokk mentioned in relation to the current offense was the same group involved in the 1999 incident. Third, there was no evidence that the Asians at the park a week before Fola's shooting were associated with any gang. Although the use of individuals' street names, the possible presence of red, blue, or brown gang colors at the time of the shooting, and the distinctive spelling of Kushmen Blokk may suggest gang

it is better practice to conduct this analysis on the record, this error is not dispositive here.

[35] Generally, if the trial court admits such evidence, it must provide the jury with a limiting instruction specifying the purpose of the evidence. *Foxhoven*, 161 Wn.2d at 175. Other than the limiting instruction related to the jail cell graffiti, the trial court gave no limiting instruction relating to gang evidence. The parties do not argue that the trial court erred by failing to give a limiting instruction.

association, this evidence may reflect ganglike traditions that the defendants merely absorbed into their culture. Furthermore, the evidence indicated that the three gang colors that were displayed were not identified with different groups the night of the shooting. And, even assuming the State demonstrated that the defendants were associated with Kushmen Blokk, it was not established by a preponderance of the evidence that Kushmen Blokk was a gang. Thus, the trial court abused its discretion in finding that gang association evidence was admissible.[36]

## B. Ringer's Testimony

¶83 Williams and Asaeli also challenge the trial court's admission of Ringer's testimony as a gang expert. Because the trial court abused its discretion in admitting the gang association evidence, it also abused its discretion in admitting Ringer's testimony.

¶84 The key criteria for admission of expert testimony are a qualified witness and helpful testimony. *State v. Cauthron*, 120 Wn.2d 879, 890, 846 P.2d 502 (1993), *overruled in part on other grounds by State v. Buckner*, 133 Wn.2d 63, 65-67, 941 P.2d 667 (1997); *see also* ER 702.[37] Ringer's testimony was relevant and potentially helpful to the jury only if the jury heard the gang association evidence. Because we conclude that the trial court abused its discretion when it admitted the gang association evidence,

---

[36] Because we hold that the evidence did not establish Kushmen Blokk was a gang, we need not examine the purpose for which the evidence was introduced, determine whether the evidence was relevant to prove an element of the crime charged, or weigh the probative value of the evidence against its prejudicial effect. *See Pirtle*, 127 Wn.2d at 648-49. We note, however, that even if the trial court had not abused its discretion in finding that Kushmen Blokk was a gang, this evidence and the evidence of Vaielua's, Williams's, or Asaeli's association with Kushmen Blokk was, at best, thin but it was extremely and unduly prejudicial.

[37] ER 702 provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Ringer's testimony was neither relevant nor helpful to the jury, particularly in light of Ringer's paucity of knowledge about Samoan culture, gangs, and informants. Not only was Ringer's expert testimony not probative due to its general and conclusory nature[38] but, as we discuss below, it was highly and unduly prejudicial.

## C. Prejudice

¶85 We must next determine whether the erroneous admission of the gang association evidence and the gang expert testimony was unfairly prejudicial to Williams and Asaeli. *State v. Bourgeois*, 133 Wn.2d 389, 403, 945 P.2d 1120 (1997) (evidentiary error is grounds for reversal only if the error is prejudicial). "An error is prejudicial if, 'within reasonable probabilities, had the error not occurred, the outcome of the trial would have been materially affected.'" *State v. Neal*, 144 Wn.2d 600, 611, 30 P.3d 1255 (2001) (quoting *State v. Smith*, 106 Wn.2d 772, 780, 725 P.2d 951 (1986)).

### 1. Williams

¶86 Although the evidence was sufficient to support Williams's conviction, that evidence is weaker if the gang association and gang expert testimony is not considered. The non-gang-related evidence was clearly sufficient to show that Williams approached and challenged Fola to a fight. But the gang association evidence was arguably strongest against Williams because of the graffiti in his jail cell and, therefore, most prejudicial to Williams. This is a very close call, given the sufficiency of the other evidence supporting Williams's conviction. But the inflammatory nature of gang evidence generally, the weakness of the evidence linking Williams to Kushmen Blokk or showing that Kushmen Blokk is an established gang, Ringer's

---

[38] The State and the trial court acknowledged that Ringer's testimony was general when, based on the State's objection, the trial court precluded Vaielua's cross-examination about the cultural aspects of gangs, ruling that such questions exceeded the scope of direct examination.

general testimony that repeatedly characterized gang members as violent—coupled with Ringer's lack of knowledge about Samoan gangs or culture—cause us to conclude that there was a reasonable probability that, had the trial court not admitted the general or expert gang evidence, the result of the trial would have differed with regard to Williams. Accordingly, we reverse Williams's conviction. Because we conclude, however, that the evidence was sufficient to support his conviction,[39] we reverse and remand for further proceedings rather than dismiss. Having reversed and remanded on this ground, we do not reach Williams's other arguments other than those that are also relevant to Asaeli's appeal.[40]

### 2. Asaeli's Claims—Gang Evidence

¶87 In contrast to Williams's case, the evidence supporting Asaeli's first degree murder and first degree assault convictions was strong enough to overcome any prejudice that resulted from the trial court's erroneous admission of the gang association evidence and gang expert testimony.

### a. First Degree Murder by Extreme Indifference

¶88 To find Asaeli guilty of first degree murder by extreme indifference, the jury had to find that, under circumstances manifesting an extreme indifference to human life, Asaeli engaged in conduct that created a grave risk of death to Fola and thereby caused Fola's death. RCW

---

[39] Under the sufficiency of the evidence standards, we are required to take the evidence and all inferences arising from that evidence in the light most favorable to the State. *Joy*, 121 Wn.2d at 338; *Salinas*, 119 Wn.2d at 201. Under that standard of review, we hold that, even without the gang evidence, the evidence was sufficient to convict Williams. But the prejudice standard applicable to an evidentiary error does not require that the evidence be considered in the light most favorable to the State. *See Neal*, 144 Wn.2d at 611 ("An [evidentiary error] is prejudicial if, 'within reasonable probabilities, had the error not occurred, the outcome of the trial would have been materially affected.'" (quoting *Smith*, 106 Wn.2d at 780)).

[40] These are (1) the admissibility of the threatening phone calls to Fola's sister and (2) the prosecutorial misconduct during closing argument issues.

9A.32.030(1)(b). Additionally, in order to conclude that Asaeli acted in self-defense, the jury had to find that Asaeli "employed such force and means as a reasonably prudent person would use under the same or similar conditions as they reasonably appeared to [Asaeli], taking into consideration all the facts and circumstances as they appeared to him, at the time of and prior to the incident." ACP at 73 (Instruction 20).

¶89 Asaeli admitted that he shot Fola and the evidence showed that he shot Fola 7 to 10 times. Although the gang association and gang expert evidence arguably had some prejudicial effect because of the generally prejudicial nature of such evidence, given the number of times Asaeli shot Fola, there is no reasonable probability that the jury would have found that Asaeli did not manifest extreme indifference to human life or that he used "such force and means as a reasonably prudent person" would have used under similar circumstances. ACP at 73. Thus, we hold that there was no reasonable probability the outcome of the trial with respect to Asaeli's first degree murder conviction would have been materially different and we need not reverse that conviction.

### b. First Degree Assault

¶90 Under the instructions in this case, to find Asaeli guilty of the first degree assault of Misionare, the jury had to find that Asaeli assaulted Misionare with a firearm and that he acted with intent to inflict great bodily harm on Fola or Misionare. ACP at 80. The jury instructions defining "assault" stated:

> An assault is also an act, with unlawful force, done with the intent to create in another apprehension and fear of bodily injury, and which in fact creates in another a reasonable apprehension and imminent fear of bodily injury even though the actor did not intend to actually inflict bodily injury.

ACP at 81 (Instruction 29).

¶91 Asaeli admitted that he shot at Fola, who was sitting in the driver's seat of Ramaley's car, and it is

uncontroverted that Misionare was in the car with Fola when Asaeli intentionally shot into it multiple times. At the very least, this was an act done with the intent to create in another apprehension and fear of bodily injury. Additionally, Misionare's testimony established that she saw at least two of the bullets come through the car's windshield and that she lay down in the back seat after Asaeli started shooting. Although Misionare did not testify that she was afraid she would be shot and injured, the fact she was aware of the gunfire and took the only cover she could creates a very strong inference that the shooting created an apprehension and imminent fear of bodily injury. And there is no doubt that this fear was reasonable given the circumstances. Thus, the evidence that Asaeli committed an assault with a firearm against Misionare is very strong. Additionally, as we discuss above, there is no reasonable probability that the jury would have accepted Asaeli's self-defense claim had the trial court excluded the gang evidence, especially in light of the total lack of evidence that Misionare posed any threat to Asaeli. Accordingly, the remaining question is whether there was a reasonable probability that the jury would have determined that Asaeli did not act with intent to inflict great bodily harm if the trial court had not admitted the gang evidence.

¶92 The trial court defined "great bodily harm" as "bodily injury that creates a probability of death, or that causes significant serious permanent disfigurement, or that causes a significant permanent loss or impairment of the function of any bodily part or organ." ACP at 82 (Instruction 30). And the to-convict instruction for the first degree assault against Misionare required the jury to find that Asaeli "acted with intent to inflict great bodily harm upon Faalata Fola *or* . . . Misionare." ACP at 80 (Instruction 28) (emphasis added).

¶93 Even without the gang evidence, there was abundant evidence, including Asaeli's own admission, that he intentionally shot into the car 7 to 10 times. Based on this evidence, we conclude that there was no reasonable prob-

ability that the jury would have found that Asaeli did not act with intent to inflict bodily injury on Fola or Misionare in a manner that created a probability of death when he shot into the car. Accordingly, we hold that there was no reasonable probability the outcome of the trial with respect to Asaeli's first degree assault conviction would have been materially different had the trial court not admitted the gang evidence and we need not reverse that conviction.

## III. ASAELI'S OTHER CLAIMS

### A. Severance

¶94 Asaeli also challenges the trial court's denial of his repeated motions to sever, arguing that we should reverse his first degree murder and first degree assault convictions due to this error. This argument has no merit.

¶95 "Separate trials are not favored in this state." *State v. Dent*, 123 Wn.2d 467, 484, 869 P.2d 392 (1994). CrR 4.4(c)(2) provides for the severance of defendants on the grounds Asaeli now asserts; it states:

> The court, on application of the prosecuting attorney, or on application of the defendant other than under subsection (i), should grant a severance of defendants whenever:
>
> (i) if before trial . . . it is deemed appropriate to promote a fair determination of the guilt or innocence of a defendant; or
>
> (ii) if during trial upon consent of the severed defendant, it is deemed necessary to achieve a fair determination of the guilt or innocence of a defendant.

¶96 We review a trial court's denial of a motion to sever for abuse of discretion. *State v. Lane*, 56 Wn. App. 286, 298, 786 P.2d 277 (1989). "'A trial court abuses its discretion when its decision is manifestly unreasonable or based upon untenable grounds.'" *State v. Perrett*, 86 Wn. App. 312, 319, 936 P.2d 426 (1997) (quoting *Havens v. C&D Plastics, Inc.*, 124 Wn.2d 158, 168, 876 P.2d 435 (1994)).

¶97 In the severance context:

> The defendant "must be able to point to specific prejudice" to support a claim that the trial court abused its discretion. [*State*

*v.*] *Wood,* 94 Wn. App. [636,] 641[, 972 P.2d 552 (1999)]. Specific prejudice may be demonstrated by showing:

"... (2) a massive and complex quantity of evidence making it almost impossible for the jury to separate evidence as it related to each defendant when determining each defendant's innocence or guilt; ... (4) or gross disparity in the weight of the evidence against the defendants."

*State v. Canedo-Astorga,* 79 Wn. App. 518, 528, 903 P.2d 500 (1995) (quoting *United States v. Oglesby,* 764 F.2d 1273, 1276 (7th Cir. 1985)).

*State v. Larry,* 108 Wn. App. 894, 911, 34 P.3d 241 (2001). Furthermore, when a defendant seeks to sever his trial from a codefendant's, he has "the burden of demonstrating that a joint trial would be so manifestly prejudicial as to outweigh the concern for judicial economy." *State v. Hoffman,* 116 Wn.2d 51, 74, 804 P.2d 577 (1991).

¶98 Asaeli contends that "the massive and complex quantity of gang evidence against the co-defendants made it impossible for the jury to properly allocate that evidence between the co-defendants and Asaeli." He argues that "the evidence of the co-defendants' association with Kushman Blokk, including the graffiti on Williams' cell walls, and the related evidence suggesting that Kushman Blokk was a gang" far outweighed the gang association related to him and that the numerous limiting instructions and volume of evidence made it impossible for the jury to properly segregate the evidence. Asaeli Br. of Appellant at 37. He also asserts that the risk of prejudice from this evidence outweighed the concern for judicial economy.

¶99 We have held that the gang association evidence was not prejudicial to Asaeli in light of his admission that he shot Fola and the evidence that would have allowed the jury to reject Asaeli's self-defense claim due to his overly aggressive response to any perceived threat. Furthermore, even though there were many limiting instructions in this case, the trial court's limiting instruction about Williams's jail cell graffiti was specific, clear, and distinct from most of the

other limiting instructions, which largely pertained to the admissibility of the witnesses' prior statements for impeachment purposes. It is unlikely that the jury was unable to apply these limitations when considering the remaining evidence, and the gang association evidence was not so massive or complex that it was impossible for the jury to segregate the evidence relative to each codefendant.

¶100 A defendant moving for severance must show more than that joinder resulted in some prejudice; he must show that the "joint trial would be so manifestly prejudicial as to outweigh the concern for judicial economy." *Hoffman*, 116 Wn.2d at 74. Because we hold that the erroneous admission of the gang evidence did not prejudice Asaeli and the evidence of Asaeli's involvement in the shooting was so strong, Asaeli does not establish that the risks presented by the joint trial outweighed the need for judicial economy. We defer to the trial court and hold that the trial court did not abuse its discretion when it denied Asaeli's motions to sever.

B. Threatening Telephone Calls to Fola's Sister

¶101 Asaeli further argues that we should reverse his first degree murder and first degree assault convictions because the trial court erred when it refused to exclude the evidence from Fola's sister, Roseann Fola, about telephone calls to the Fola house in the weeks preceding the shooting. He contends that this evidence was irrelevant and unduly prejudicial because there was no evidence linking these calls to Vaielua, Williams, Asaeli, or anyone associated with them. He also argues, in effect, that this error was prejudicial because it increased the chances that the jury would find that the group planned to confront and/or harm Fola.

¶102 The State argues that Asaeli failed to preserve this alleged error because the trial court deferred its ruling on the preliminary motions to exclude this testimony and Asaeli did not raise this issue again when Roseann[41] testified. We agree.

---

[41] Because Faalata Fola, James Fola, and Roseann Fola share the same last name, we refer to Roseann by her first name to avoid confusion and intend no disrespect.

### 1. Related Facts

¶103 Before trial, Vaielua, Williams, and Asaeli moved in limine to preclude Fola's mother and sister from testifying about calls they received before Fola's death; these callers stated that Fola was "marked" or otherwise threatened to kill or harm Fola. II ARP at 188. Vaielua, Williams, and Asaeli argued that there was no foundation because the callers were unknown; the State had not demonstrated any link between Vaielua, Williams, and Asaeli and the calls; and the calls were irrelevant and unduly prejudicial.[42] The State responded that, although Fola's mother and sister could not identify the callers, the jury could reasonably infer that the calls were placed by people involved in Fola's subsequent death. The State also argued that this evidence was relevant to Asaeli's self-defense claim.

¶104 The trial court denied the appellants' motions, stating, "I'll deny the motion at this time. This is one of those cases where you have to hear the testimony as it comes in. But at this time I'm going to deny the motion. I'm not going to limit or suppress the testimony regarding the threats." II ARP at 193-94.

¶105 At trial, Roseann testified that approximately two weeks before Fola's death, she received a call from a man who asked for "Blacc." When she told the caller Fola was not there, the man told her to "let ['Blacc'] know he was marked" and then hung up. She did not know who the caller was and testified that the caller was "kind of like giggling on the phone" when he relayed the message. VIII ARP at 1125-26. She interpreted the man's statement as meaning that Fola "was a target." VIII ARP at 1128.

¶106 Roseann further testified that a week before Fola was killed she received a second call from a man asking for "Blacc." When she told this caller that Fola was not there, the caller "wanted [her] to relay a message to Blacc, that

---

[42] Asaeli also argued at trial that the alleged threats were hearsay and inadmissible under ER 801 and ER 802. He does not raise this issue on appeal.

they were going to drop him." VIII ARP at 1127. No one objected to this testimony at trial.

### 2. Waiver

¶107 The purpose of a motion in limine is to resolve legal matters out of the jury's presence in such a way as to permit counsel to make comments that might be prejudicial to their position; a party losing the motion in limine has a standing objection, unless the trial court indicates its ruling is tentative and further objections are required. *State v. Kelly*, 102 Wn.2d 188, 193, 685 P.2d 564 (1984). Here, the trial court clearly indicated that its ruling on the motions in limine was preliminary and tentative and that the parties should raise this issue again as the evidence developed in trial. But no one raised an objection. Accordingly, we hold that Asaeli waived this issue and we decline to address it further. RAP 2.5(a).

### C. Prosecutorial Misconduct

¶108 Asaeli next asserts that the prosecutor committed misconduct by misstating the law in a computer generated slide presentation accompanying his closing argument. We hold that, to the extent the prosecutor's slides and argument may have been improper, they were not prejudicial.

### 1. Standard of Review

¶109 To prevail on a claim of prosecutorial misconduct, Asaeli must prove that (1) the prosecutor's comments were improper and (2) the comments were prejudicial. *State v. McKenzie*, 157 Wn.2d 44, 52, 134 P.3d 221 (2006). A prosecutor's improper comments are prejudicial "only where 'there is a *substantial likelihood* the misconduct affected the jury's verdict.'" *McKenzie*, 157 Wn.2d at 52 (quoting *State v. Brown*, 132 Wn.2d 529, 561, 940 P.2d 546 (1997)). We evaluate the prejudicial effect of a prosecutor's improper comments by looking at the comments "in the context of the total argument, the issues in the case, the evidence addressed in the argument, and the instructions given to the jury." *Brown*, 132 Wn.2d at 561.

¶110 Additionally,

> Reversal is not required if the error could have been obviated by a curative instruction which the defense did not request. The failure to object to a prosecuting attorney's improper remark constitutes a waiver of such error unless the remark is deemed to be so flagrant and ill intentioned that it evinces an enduring and resulting prejudice that could not have been neutralized by an admonition to the jury.

*Hoffman*, 116 Wn.2d at 93 (footnote omitted).

## 2. Related Facts

¶111 Early in the State's closing argument, the prosecutor displayed, but did not discuss, a slide that stated, "When a challenge to a fight is used as an excuse to kill, it's murder!" ACP at 133 (slide 1). Vaielua, Williams, and Asaeli objected to this slide, arguing that (1) it was "not a statement of the law that's in the jury instructions" because the trial court had previously refused to give the jury a first aggressor instruction and (2) the prosecutor was presenting the slide as a statement of the law, not as argument. Williams also asserted that the slide was "an improper statement of the law." XIII WRP at 1944. The trial court overruled these objections, stating that it had instructed the jury on the law and that counsels' arguments and statements in closing were not the law. The prosecutor continued his argument.

¶112 After arguing that the jury should conclude that the evidence showed the confrontation and shooting were planned and intentional, the prosecutor returned to his slide presentation, stating that he would now discuss the numerous jury instructions, attempt to put the instructions into context with the evidence, and give the jury some suggestions on the deliberation process. The prosecutor stated, "[S]o let's start with the law." XIII WRP at 1957.

¶113 The prosecutor first told the jury that it would be unnecessary to look at the trial court's instructions as he gave this "overview of *what the law is*," noting that the jury

would be able to look at the instructions during its deliberations. XIII WRP at 1957 (emphasis added). After discussing the purpose of the to-convict instructions, the State's burden of disproving self-defense, and accomplice liability, the prosecutor turned to the self-defense issue and displayed slide 6 which read,

> Self-defense: Killing after a challenge to a fight is not lawful defense, it's murder.

ACP at 134 (Slide 6) (emphasis omitted). The prosecutor argued:

> Okay. The next aspect of the jury instructions that I'm going to focus on is self-defense; and under self-defense, there are a number of instructions dealing with self-defense. First, there is the definition of self-defense; and then there are several instructions that further elaborate on different terms used in self-defense; and again, I'm not going to go through, chapter and verse, through each of those instructions. I leave to you folks the task of going through those instructions and making sure you understand exactly what self-defense is.

XIII WRP at 1969. Williams and Vaielua objected to this slide, arguing that it was not an accurate statement of the law.

¶114 The prosecutor responded, "It's not an instruction at all, *It's my words as to what the instructions mean.*" XIII WRP at 1970 (emphasis added). The trial court overruled Williams and Vaielua's objection, stating that this was argument, not the law, and that the jury has been instructed as to the law.

¶115 The prosecutor returned to his discussion of self-defense, turning to what he referred to as the four elements of self-defense. At this point, he displayed slide 7:

> Four Required Elements
> 1. ". . . committed in the lawful defense. . ."
> 2. ". . . reasonably [actually] believed. . ."
> 3. ". . . imminent danger. . ."
> 4. ". . . such force and means as a reasonably prudent person would use. . ."
>
> State's burden is to disprove one of these elements.

ACP at 135 (Slide 7) (emphasis omitted). No one objected to this slide.

¶116 The prosecutor then turned to the first "element," "lawful defense," and displayed slide 8:

### Lawful Defense

". . . lawful defense of the slayer or any person in the slayer's presence. . ."

### Means

One can't plan or threaten to do harm to a person then shoot him, that's not "lawful defense".

ACP at 135 (Slide 8) (emphasis omitted). No one objected to this slide.

¶117 The prosecutor stated that for an act to be self-defense, it had to be committed in "lawful defense," and he invited the jury to look at instruction 25, which stated:

A person is entitled to act on appearances in defending himself or another, if that person believes in good faith and on reasonable grounds that he or another is about to suffer death or danger of great personal injury, although it afterwards might develop that the person was mistaken as to the extent of the danger.

Actual danger is not necessary for a homicide to be justifiable.

ACP at 77. The prosecutor then argued that credibility was the key to this element because the jury would have to believe Asaeli's assertion that he fired at Fola in self-defense, with a good faith, reasonable belief that he needed to act in self-defense.

¶118 The prosecutor then displayed slides 9 through 12.

### From An Attack

". . . reasonably believes that the person slain intended to inflict death or great personal injury. . ."

### Means

An actual belief (not one made up for trial) that he will be (not just a possibility) killed or mortally wounded.

ACP at 135 (Slide 9) (emphasis omitted).

### Imminent Danger

". . . that there was imminent danger of [death or great personal injury] being accomplished. . . "

### Means

If a killing, it was the slayer[']s life or the victim's.

ACP at 135 (Slide 10) (first alteration in original).

### Reasonable Amount of Force

". . . such force and means as a reasonably prudent person would use . . . "

### Means

Overreaction is not permitted. If there was a non-lethal alternative it must be used if reasonable.

ACP at 135 (Slide 11) (emphasis omitted).

### Killing Is Not Lawful When . . .

*No provocative behavior by the victim
*No verbal warning: "Stop or I'll shoot!"
*No warning shot
*No attempt to hold at gunpoint
*No taking cover
*Victim is shot seven times and had no means to shoot back
*Putting other people at risk.

Killing is not lawful as the first, last and only action taken against a person sitting in his own car minding his own business!

ACP at 135 (Slide 12) (emphasis omitted).

¶119 As he displayed these slides, the prosecutor argued that the evidence must also show that Asaeli believed that the person he shot intended to inflict death or great

personal injury and that death or great personal injury was imminent. He questioned whether Asaeli's testimony that Fola put a gun out the window, shot at Williams, and then pointed the gun at him was credible. He further argued that for Asaeli's actions to be self-defense, Asaeli had to be in a "him or me" situation. The prosecutor then questioned Asaeli's credibility, suggesting that Asaeli's response to the situation after the shooting did not support his assertion that he had "barely escaped death," noting that Asaeli did not try to hide but went toward Fola while shooting. XIII WRP at 1973.

¶120 After the trial court dismissed the jury for lunch, Williams objected to the State's earlier slide presentation, this time asserting that the State had put up another slide that "misstate[d] the law of self-defense." Referring to slide 12, Williams argued that it seemed to "indicate that there is some sort of duty to retreat or to take cover or something of that nature." Williams also renewed his prior objections, stating, "[T]he Court can instruct the jury until the cows come home that that's not the statement of the law or as to the jury instructions; but when it says lawful, it purports to be an instruction on what the law is; and it's not accurate." XIII WRP at 1976. Asaeli joined in these objections and further noted that the State's slides, apparently particularly slide 12, referenced a failure to fire a warning shot and suggested a duty to retreat or hide, neither of which were required under the law. Vaielua joined in the objections.

¶121 The prosecutor responded that the "last slide was [his] take on the facts and why they don't amount to self-defense." XIII WRP at 1978. He further asserted that he was merely arguing the facts to the jury.

¶122 The trial court agreed with the prosecutor, concluding that the prosecutor was making his argument, that the jury was instructed on the law, and that counsel's arguments were not the law. It indicated that the prosecutor had made clear to the jury that he was not stating what the law was but, rather, merely presenting argument.

¶123 When the jury returned from lunch, the prosecutor informed it that he was almost done "talking about the law" and stated:

> If during your deliberations, you have some questions on the law, look at the instructions; read through it; and the instructions tell you that if you have some question about it that you feel you need more instructions about, I'm not going to guarantee that you'll get it, but there's also the provision for you to send a note out to the Court about it.

XIII WRP at 1980-81. The prosecutor then indicated that he was moving on to "a discussion of the evidence." XIII WRP at 1981.

¶124 The prosecutor displayed more slides showing various diagrams of the scene and highlighting specific testimony as he discussed the evidence. He discussed the role of the jury in making credibility determinations and noted the multitude of coincidences[43] that had to have occurred for the shooting to take place the way it did and showed a variety of slides supporting this discussion.

¶125 After discussing all of the coincidences, the prosecutor returned to Asaeli's self-defense claim. At this point, he showed slide 13:

> Self Defense Is
>
> A near death experience
> Unforgettable
> A him or me decision
> Apparent to those around
> Something that affects what happens afterward
> In short true self defense is known to the "slayer" and to those who saw what the "slayer" did!

ACP at 138 (Slide 13) (emphasis omitted). He argued that the evidence showed that Asaeli did not respond as if he were acting in self-defense.

---

[43] The prosecutor noted that there were "some 34 coincidences that would have had to occur for the defendant's testimony about this shooting to work out the way it did." XIII WRP at 2008.

¶126 After discussing accomplice liability, the prosecutor summarized his argument and urged the jury to find that "[t]his was a killing. This was an intentional, premeditated, thought-over-beforehand killing; and it's first degree murder." XIII WRP at 2018. At this point, the State again displayed the first slide, which stated:

> When a challenge to a
> fight is used as an
> excuse to kill, it's
> murder!

ACP at 138 (Slide 14) (emphasis omitted).

¶127 During their closing arguments, Williams's and Asaeli's counsel reminded the jury repeatedly that the prosecutor's argument was not the law and that the jury must look to the written instructions and not rely on argument or the prosecutor's slides. Counsel also emphasized that the prosecutor's suggestion that a warning shot was required for self-defense was not the law.

¶128 In rebuttal, the prosecutor largely summarized his prior argument. In addition, he agreed with defense counsel's assertions that there was no duty to retreat in order to claim self-defense, but he asserted that the jury could look to Asaeli's actions, including his failure to try to take cover, when evaluating Asaeli's credibility.

3. Discussion

a. First Aggressor Concept

¶129 Asaeli challenges slides 1, 6, and 14, asserting that these slides implied the first aggressor limitation that the trial court had rejected. Slide 1 was the only one of these slides Vaielua, Williams, and Asaeli objected to on this specific ground.

¶130 In slide 1, any potential error appears harmless. Standing alone, this slide may suggest the first aggressor concept, but it does not clearly state that the jury could not find self-defense under the first aggressor doctrine. Furthermore, throughout closing argument the parties repeatedly reminded the jury that it was to rely on the trial

court's instructions and not counsel's statements about the law when it came time to deliberate. In addition, the trial court instructed the jury that statements made during argument were not the law. Accordingly, slide 1 alone did not result in prejudicial error.

¶131 When we examine all the prosecutor's slides and argument as a whole, the risk that the jury would understand the slides to be a statement of the law about self-defense is higher. But only slide 1 was objected to on this ground and there was no objection that the slides cumulatively introduced the first aggressor concept. Thus, examining whether the slides as a whole were prejudicial, we apply the more stringent standards for when a defendant fails to raise an objection during argument.

¶132 Even though the prosecutor did not expressly state that these slides were the law, he discussed several in the context of "explaining" the law. Furthermore, when read together, the slides suggest that self-defense is unavailable if the defendant acted first; this erroneous statement of the law is aggravated by the prosecutor's use of the term "lawful defense" throughout, suggesting that he, not the trial court, was presenting statements of law. But "[s]tatements by the prosecution or defense to the jury upon the law must be confined to the law as set forth in the instructions given by the court." *State v. Davenport*, 100 Wn.2d 757, 760, 675 P.2d 1213 (1984).

¶133 Had Vaielua, Williams, or Asaeli continued to object to the prosecutor's statements and argued that their cumulative effect introduced the first aggressor concept, the trial court could have alleviated any potential prejudice by instructing the jury that it was not to consider first aggressor issues. But the defendants did not continue to object; nor did they request a curative or limiting instruction. We hold that the prosecutor's slides were not so flagrant and ill intentioned that a curative instruction or admonition to the jury would not have neutralized any resulting prejudice and, having failed to object below, Asaeli has failed to show

that he is entitled to appellate relief on this basis. *Hoffman*, 116 Wn.2d at 93.

### b. Subjective Belief Standard

¶134 Asaeli next argues that slides 7, 9 through 11, and 13 misstated the subjective belief standard that applies in the self-defense context. No one specifically objected to these slides. Accordingly, to be entitled to relief on appeal, Asaeli must show that these slides were so flagrant and ill intentioned that they evinced an enduring and resulting prejudice that could not have been neutralized by an admonition to the jury. *Hoffman*, 116 Wn.2d at 93. Again, if anyone had objected to these instructions on this basis, the trial court could have instructed the jury that the subjective belief standard stated in the jury instructions applied. But no such objection was raised; thus, Asaeli is not entitled to relief on this ground.

¶135 Furthermore, the prosecutor's argument taken as a whole does not misrepresent the subjective belief standard. In fact, when discussing slide 8, the prosecutor stated that, to be self-defense, an act had to be committed in "lawful defense." And he invited the jury to look at instruction 25, which stated:

> A person is entitled to act on appearances in defending himself or another, if that person believes in good faith and on reasonable grounds that he or another is about to suffer death or danger of great personal injury, although it afterwards might develop that the person was mistaken as to the extent of the danger.
>
> Actual danger is not necessary for a homicide to be justifiable.

ACP at 77.

¶136 Given this statement and the parties' repeated admonitions to the jury that it needed to apply the law in the trial court's instructions and not as represented in argument, any misstatement of the subjective belief standard was not prejudicial.

### c. Implied Duty To Retreat

¶137 Asaeli also challenges slide 12, arguing that it was a misstatement of the law because it implied a duty to retreat. Asaeli objected to this slide and the related argument on this ground. Even though the jury could have construed slide 12 as imposing a duty to retreat, the prosecutor cured this potential error when he stated in his rebuttal argument that he agreed with defense counsel's assertion that there was no duty to retreat in order to claim self-defense. Accordingly, we hold that this argument is without merit.

## IV. CUMULATIVE ERROR

¶138 Finally, Asaeli argues that he is entitled to relief under the cumulative error doctrine.[44] Under this doctrine, a defendant may be entitled to a new trial when errors, even though individually not prejudicial, cumulatively result in a trial that was fundamentally unfair. *State v. Greiff*, 141 Wn.2d 910, 929, 10 P.3d 390 (2000); *In re Pers. Restraint of Lord*, 123 Wn.2d 296, 332, 868 P.2d 835 (1994). Asaeli bears the burden of proving an accumulation of errors that would make a retrial necessary. *Lord*, 123 Wn.2d at 332.

¶139 Asaeli argues that the following errors cumulatively denied him his right to a fair trial: (1) prosecutorial misconduct in closing argument, (2) erroneous admission of the gang association evidence, (3) erroneous admission of Ringer's expert testimony, (4) failure to sever, and (5) erroneous admission of Roseann's testimony regarding the threatening telephone calls she received. As we discuss above, Asaeli waived any claim of error related to the admission of Roseann's testimony regarding the threatening calls and the trial court did not err when it denied Asaeli's motions to sever. We also conclude that two of the

---

[44] Although Asaeli does not state that his cumulative error argument applies only to his first degree murder and assault convictions, the errors he addresses do not relate to his possession of a stolen firearm conviction.

three arguments Asaeli raised about the prosecutor's closing argument have no merit. Accordingly, we address the cumulative effect only of the potential prosecutorial misconduct related to the introduction of the first aggressor concept and the erroneous admission of the gang association and gang expert evidence.

¶140 As discussed above, the prosecutor may have presented improper argument regarding the first aggressor concept. The trial court also erred when it admitted the gang association and gang expert evidence. As we discussed in the prejudice analysis related to the erroneous admission of the gang evidence, Asaeli's admission that he shot Fola and the evidence that Asaeli shot Fola up to 10 times supports the jury's guilty finding of extreme indifference on the first degree murder conviction, the assault conviction, and the jury's rejection of Asaeli's self-defense claim. Furthermore, even if the prosecutor improperly introduced the first aggressor concept during his closing argument, the jury had an independent basis upon which it could have rejected Asaeli's self-defense claim because of Asaeli's excessively forceful response to any perceived threat when he repeatedly fired into the car in which Fola remained seated. Accordingly, we conclude that the cumulative effect of these potential errors was not harmful and Asaeli's cumulative error argument fails.

¶141 We (1) reverse Vaielua's conviction and remand for dismissal of his conviction with prejudice, (2) reverse William's conviction and remand for further proceedings, and (3) affirm Asaeli's convictions.

BRIDGEWATER and HUNT, JJ., concur.

Review denied at 167 Wn.2d 1001 (2009).