IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| THE STATE OF WASHINGTON,<br><br>                Respondent,<br><br>            v.<br><br>ABBAS SALAH ZGHAIR,<br><br>                Appellant. | No. 83489-4-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

CHUNG, J. — A jury convicted Abbas Zghair of felony murder in the second degree while committing assault in the second degree with a firearm enhancement. On appeal, Zghair challenges the sufficiency of the State's evidence, its exercise of a peremptory challenge, and the trial court's failure to instruct the jury regarding the missing witness doctrine. We hold that the evidence was insufficient to support Zghair's conviction either as a principal or an accomplice. We reverse and remand for dismissal of Zghair's conviction with prejudice.[1]

FACTS

A passerby found the body of Silvano Ruiz Perez in a gravel field at the site of an old drive-in theater in Auburn, Washington, the morning of Sunday, March 24, 2019, and called the police. A medical examiner later determined that

---

[1] Because we reverse for insufficiency of evidence, we do not address Zghair's additional assignments of error.

Ruiz Perez had died from a gaping shotgun wound to his left forearm which was estimated to have been fired from "probably within three feet" of him. A trail of blood led from the body back to the street. Auburn police officers found a broken necklace at the scene that would later be identified as belonging to Ruiz Perez. The police did not recover a shotgun, shotgun shells, or anything associated with a shotgun at the scene.[2]

Ruiz Perez had a mobile phone provided by his employer. Although that phone was not recovered from the scene, according to phone location data obtained from the phone's service provider, Ruiz Perez went to an automated teller machine (ATM) a little after 1:00 a.m. on Saturday, March 23. Video from the ATM shows him getting out of the rear driver's side door of a white Pontiac sedan. At about 2:00 a.m., Ruiz Perez called his fiancée, taxi companies, and a coworker for a ride home. The last call from the phone was made at 2:41 a.m.

The phone location data for Ruiz Perez's phone demonstrates that the phone traveled around Kent, Washington, between 3:00 and 4:00 a.m. Traffic cameras show the white Pontiac sedan driving through the same areas at the same time. At 3:27 a.m., Ruiz Perez's phone was near a Chevron gas station. Video from that gas station shows two men entering the gas station. One man, subsequently identified as Zghair, is wearing yellow pants. The other man is wearing a red jacket or sweatshirt; his identity remains unknown. Ruiz Perez

---

[2] Nor did officers recover a shotgun or anything associated with a shotgun when they later searched Zghair's apartment.

does not appear in the video. A minute later, at 3:28 a.m., the video shows the white Pontiac leaving the gas station.

By 4:00 a.m., phone location data placed Ruiz Perez's phone near the abandoned lot where his body was later found. Traffic camera video shows the white Pontiac turning onto the street where the lot is located at 4:09 a.m., then leaving at 4:14 a.m.

Maryanne Denton testified that she heard two gunshots at about 3:30 a.m. on Saturday, March 23, 2019.[3] She and her husband Mark were living in their car and parked for the night next to the abandoned lot. After she heard the two shots, they heard people arguing in a language they believed to be Spanish, then a car leaving. The car's headlights were shining at them, so the Dentons could not identify the car or the people they had heard arguing.

Later that morning, about 9:00 a.m., traffic cameras show that the white Pontiac returned to the Chevron gas station. Records from Ruiz Perez's phone show it arrived at that area at the same time.

Location data from Zghair's phone matched the movements of Ruiz Perez's phone through the early morning hours of March 23 leading up to 4:00 a.m. and after. Google Geofence warrants for the Chevron station from 3:00 a.m. to 4:00 a.m., the homicide scene between 3:45 a.m. and 4:45 a.m., and the Chevron station again from 8:50 a.m. to 9:50 a.m. later that morning revealed no

---

[3] She states "March 22, around . . . 3:30 a.m.," but it is clear from her further testimony that she is referring to the very early morning of the next day, Saturday March 23, 2019.

phones other than Zghair and Ruiz Perez's present in those areas during those times.[4]

More than two weeks after the shooting, an officer on patrol located a vehicle near the Polaris apartments in Covington, Washington, that matched the description of a white Pontiac pictured in a bulletin that was issued to police departments. Although "someone" had moved the front license plate and tried to remove a distinctive sticker from the front windshield, the car matched the white Pontiac from the videos based on its mirrors, its wheels, and damage to the car. The car was registered to Zghair. The same day that police found the Pontiac, Zghair pawned his mobile phone.

A Federal Bureau of Investigation (FBI) team searched Zghair's Pontiac. The car "had a very strong smell of cologne or something." The rear passenger seat behind the driver was torn. The tear was toward the window side of the seat, and blood was found in the cushion in the same area. The FBI team recovered small amounts of blood from the cushion and the car's door jamb, and DNA[5] tests matched that blood to Ruiz Perez. They recovered birdshot from the seat cushion after it was x-rayed.

---

[4] At trial, Detective Arneson explained that a Google Geofence is "an imaginary fence . . . around a location and by providing . . . this fence . . . to Google, they will provide for a date and a time[ t]he user ID numbers for . . . every phone that contacts their network." The area centered on the Chevron station encompassed a 100-meter radius. The area centered on the homicide scene encompassed a 200-meter radius. The evidence at trial suggests Maryanne Denton's phone was in the vicinity, as she was "watching a movie on [her] phone" at the scene when she heard two shots at about 3:30 a.m. Saturday. Also, the man in the red jacket is pictured with Zghair at the Chevron gas station at 3:27 a.m. Even so, neither Maryanne Denton's phone nor any other phone was identified in the response to the geofence warrants.

[5] Deoxyribonucleic acid.

Police obtained a search warrant for Zghair's address of record, as he was a possible suspect. A crime response team searched this apartment three weeks after the shooting on April 12, 2019. The next day, April 13, Zghair joined two friends traveling to Canada. Canadian officials denied the group entry. Returning to the U.S. border station at Sumas, Washington, Zghair presented a friend's Washington State driver's license. Because the group had been denied entry into Canada, they were referred for further processing but not detained.

While waiting for further processing, Zghair went to a nearby gas station. Border control officers went looking for Zghair and soon located him. Zghair ran from the officers but was quickly apprehended.

Zghair was detained in Bellingham, Washington. Detectives from the Auburn Police Department investigating the murder of Ruiz Perez had asked the Department of Homeland Security to notify them if they encountered Zghair. Accordingly, border control agents notified Detectives Arneson and Walker, who interviewed Zghair at the Whatcom County Jail on April 13, 2019. In that interview, Zghair acknowledged owning the Pontiac. He explained that his license was not valid, so he did not drive the car anymore, but friends did. The detectives noted that Zghair had shaved off all his facial hair.

The detectives told Zghair his car had been used in a murder but gave him no other details. At trial, the videotaped interview was played for the jury:

DET WALKER:     Your car was used in the commission of a
                murder. It was involved in a murder. Someone
                drove someone somewhere and murdered
                them and then left in the car.
ZGHAIR:         What? How?

5

. . . .

DET WALKER: I think that-that you tried to earn money some wrong way and that things went bad. That's what I think happened.

ZGHAIR: what...

DET WALKER: But I would like you to tell us what happened.

. . . .

ZGHAIR: Nah I'm not like that. I'm not like that. I'm . . .

DET ARNESON: So you're just [sic] and killed him for no reason.

. . . .

ZGHAIR: Killed who? What are you guys talkin' about? I can't use a gun. Um I don't know how to use guns. What are you guys talkin' about?

DET WALKER: What do you mean you don't know how to use a gun?

ZGHAIR: I don't know how to use a gun. Come on man.

The detectives then asked about the man in red:

DET WALKER: The guy in red.

DET ARNESON: Who was that?

ZGHAIR: Guy in the red?

DET WALKER: Yeah. Black dude. Bright red jacket.

ZGHAIR: I-I-I don't know what you guys are talkin' about man. I-I...

DET WALKER: Bright red jacket. In your white...

ZGHAIR: uh so...

DET WALKER: in your white Pontiac.

ZGHAIR: I told you if you guys talkin' about a Mexican guy...

DET WALKER: No.

ZGHAIR: yes, I picked him up from gas station. I drop him off. I'm telling you the truth.

Zghair admitted taking the person he described as the "Mexican guy," to the

ATM, where the man withdrew $100. He said the man wanted to buy "coke."

The State charged Zghair with felony murder in the second degree while committing assault in the second degree with a firearm enhancement. The jury was instructed on both liability as a principal and as an accomplice. It returned a general verdict of guilty and affirmatively answered a special verdict asking if Zghair was armed with a firearm at the time of the commission of the crime. The court sentenced Zghair to a standard range term of 192 months plus the 60-month mandatory firearm enhancement, for a total of 252 months. He timely appeals.

ANALYSIS

Zghair challenges the State's evidence as insufficient to convict him of felony murder as either the principal who shot Ruiz Perez, resulting in his death, or as an accomplice to that shooting. The sufficiency of the evidence is a question of constitutional law that we review de novo. State v. Rich, 184 Wn.2d 897, 903, 365 P.3d 746 (2016). The State bears the burden of proving all the elements of an offense beyond a reasonable doubt. Rich, 184 Wn.2d at 903 (citing In re Winship, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970); U.S. CONST. amend. XIV; WASH. CONST. art. I, § 3). "A 'modicum' of evidence does not meet this standard." Rich, 184 Wn.2d at 903 (quoting Jackson v. Virginia, 443 U.S. 307, 320, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)).

"A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). "In determining the sufficiency of the evidence, circumstantial evidence is not to be considered any less reliable than direct

evidence." State v. Delmarter, 94 Wn.2d 634, 638, 618 P.2d 99 (1980).

" '[I]nferences based on circumstantial evidence must be reasonable and cannot be based on speculation.' " Rich, 184 Wn.2d at 903 (quoting State v. Vasquez, 178 Wn.2d 1, 16, 309 P.3d 318 (2013)).

Thus, "[t]o determine if sufficient evidence supports a conviction, we consider 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime *beyond* a reasonable doubt.' " Rich, 184 Wn.2d at 903 (quoting Jackson, 443 U.S. at 319) (emphasis from Jackson and Rich) (other citations omitted). Even so, "[o]ur role as the reviewing court is not to reweigh the evidence and substitute our judgment for that of the jury." State v. Notaro, 161 Wn. App. 654, 671, 255 P.3d 774 (2011) (citing State v. Green, 94 Wn.2d 216, 221, 616 P.2d 628 (1980)). Our inquiry "impinges upon a jury's discretion only to the extent necessary to protect the constitutional standard of reasonable doubt." Green, 94 Wn.2d at 221.

Zghair was charged with and convicted of felony murder in the second degree while committing assault in the second degree. As charged here, the State had to prove that Zghair or an accomplice committed assault in the second degree and that Zghair or an accomplice caused the death of Ruiz Perez in the course of and in furtherance of such crime or in immediate flight from such crime. RCW 9A.32.050(1)(b). We consider separately the sufficiency of the State's evidence to convict Zghair as the principal and as an accomplice.

I.      Liability as a principal

To convict Zghair as a principal, the State had to prove that he committed the predicate offense of assault in the second degree. A person commits assault in the second degree when the person assaults another person with a deadly weapon. RCW 9A.36.021(c).[6] Zghair argues that there was insufficient evidence to prove he is the person who shot Ruiz Perez.

The State concedes there is no direct evidence to show that Zghair was the person who shot Ruiz Perez or that he had the requisite intent to do so.[7] Instead, the State argues the jury could reasonably infer that the shooting was intentional based on circumstantial evidence. Specifically, the State points to the early hour of the shooting, the secluded place where Ruiz Perez was shot, and the fact that he was shot at close range, "likely while still in Zghair's car," as supporting an inference that the shooter intentionally pointed the shotgun at him and intentionally pulled the trigger. The State also suggests that the assault was intentional, not accidental, as Ruiz Perez's broken necklace and the Dentons' testimony that they heard an argument provide circumstantial evidence that the shooting occurred in the context of a fight or struggle. The State further contends that a jury could infer the shooting was intentional, rather than accidental, because Maryanne Denton heard two gunshots, not one, and Ruiz Perez's assailants did not pursue him into the abandoned lot.

---

[6] A firearm is a deadly weapon. RCW 9A.04.110(6). Zghair does not dispute the sufficiency of the State's evidence that Ruiz Perez was shot with a shotgun and died from a shotgun wound.

[7] A person acts intentionally when they act with the objective or purpose to accomplish the result that constitutes a crime. RCW 9A.08.010.

But to prove that Zghair was the principal in the shooting, not only did the State have to prove that the shooting was intentional,[8] the State had to establish that Zghair was the person who shot Ruiz Perez. And while the State argued in closing that Zghair "very well could have been the human being that pointed that shotgun," it never presented evidence that supports a reasonable inference that Zghair was the shooter. Although there is evidence that Zghair's and Ruiz Perez's phones were in the car at the time of the shooting, as well as blood and birdshot in the seat cushion to connect the car to the shooting, no evidence permits an inference that connects Zghair to the act of shooting. Nor is there evidence even to connect Zghair to a shotgun; no one saw him with a shotgun, and there is no physical evidence because the weapon was never found.

There was also no evidence that Zghair had a motive to shoot Ruiz Perez; the two were "strangers" to one another who had never met before. While the State argued at closing that Ruiz Perez "possibly" was killed for his phone, the intent to commit robbery does not establish the intent for the charged crime, assault with a deadly weapon. RCW 9A.36.021. Nor does the Dentons' testimony that they overheard an argument that they thought was in Spanish connect Zghair to the shooting or establish that he had a motive to shoot Ruiz Perez. Zghair's first language is Arabic, and there was no evidence that he speaks or understands Spanish. And the argument the Dentons said they overheard happened *after* Maryanne heard two shots fired, not before.

---

[8] The jury was instructed that "[a] person acts with intent or intentionally when acting with the objective or purpose to accomplish a result that constitutes a crime." See RCW 9A.08.010.

10

" '[I]nferences based on circumstantial evidence must be reasonable and cannot be based on speculation.' " Rich, 184 Wn.2d at 903 (quoting State v. Vasquez, 178 Wn.2d 1, 16, 309 P.3d 318 (2013)). Here, determining that Zghair performed the physical act of pulling the shotgun's trigger required the jury to speculate. Viewing the evidence in the light most favorable to the prosecution, while a juror might reasonably infer from the State's evidence that *somebody* shot Ruiz Perez intentionally, we cannot say that any rational trier of fact could have found beyond a reasonable doubt that *Zghair* was the person who pulled the trigger of the shotgun that killed Ruiz Perez. Therefore, we hold that there was insufficient evidence for the jury to convict Zghair of the felony murder predicated on an assault as the principal actor.

II.     Liability as an accomplice

Next, we consider the sufficiency of the State's evidence to convict Zghair under the alternative theory that he was an accomplice. To convict Zghair of felony murder under this theory, the State was required to prove beyond a reasonable doubt that Zghair was an accomplice in the predicate crime of assault in the second degree by use of deadly weapon.

RCW 9A.08.020(3) defines when a person may be liable as an accomplice:

> A person is an accomplice of another person in the commission of a crime if:
> (a) With knowledge that it will promote or facilitate the commission of the crime, he or she:
> (i) Solicits, commands, encourages, or requests such other person to commit it; or

11

> (ii) Aids or agrees to aid such other person in planning or committing it.

RCW 9A.08.020(3).

To be an accomplice, an individual must have acted with knowledge that they were promoting or facilitating *the* crime for which they were eventually charged, not merely the knowledge that the principal intended to commit *a* crime. State v. Cronin, 142 Wn.2d 568, 579, 14 P.3d 752 (2000). A defendant has actual knowledge when "he or she has information which would lead a reasonable person in the same situation to believe" that he was promoting or facilitating the crime eventually charged. State v. Allen, 182 Wn.2d 364, 374, 341 P.3d 268 (2015) (quoting RCW 9A.08.010(1)(b)(ii)). "[T]he jury must find actual knowledge but may make such a finding with circumstantial evidence." Id. (explaining the "critical" distinction between a jury permissibly finding actual knowledge through circumstantial evidence and impermissibly finding a defendant constructively "should have known") (citing State v. Shipp, 93 Wn.2d 510, 514-16, 610 P.2d 1322 (1980)).

"To prove that one present is an aider, it must be established that one is " 'ready to assist' " in the commission of the crime. State v. Rotunno, 95 Wn.2d 931, 933, 631 P.2d 951 (1981) (quoting In re Welfare of Wilson, 91 Wn.2d 487, 491, 588 P.2d 1161 (1979)). "One does not aid and abet unless, in some way, he associates himself with the undertaking, participates in it as in something he desires to bring about, and seeks by his action to make it succeed." State v. J-R Distributors, Inc., 82 Wn.2d 584, 593, 512 P.2d 1049 (1973), cert. denied, 418

U.S. 949, 94 S. Ct. 3217, 41 L. Ed. 2d 1166 (1974). Further, to be liable as an accomplice, the person must knowingly aid the criminal enterprise of another *before* the fact. State v. Anderson, 63 Wn. App. 257, 261, 818 P.2d 40 (1991) (citing RCW 9A.08.020) (distinguishing the crime of rendering criminal assistance, in which a person knowingly aids another's criminal enterprise *after* the fact).

Here, there was circumstantial evidence that Zghair was present at the scene of the crime. Zghair's phone location data establishes that his phone was in the Pontiac, and Zghair was the owner of the phone and the registered owner and driver of the car. Further, the birdshot and blood recovered from the Pontiac connect the car to the shooting. This evidence together permits the inference that Zghair was present at the shooting.[9]

Zghair argues that his "mere presence" at the scene of the crime cannot establish his liability as an accomplice. We agree. "This court has repeatedly stated that one's presence at the commission of a crime, even coupled with a knowledge that one's presence would aid in the commission of the crime, will not subject an accused to accomplice liability." Rotunno, 95 Wn.2d at 933. See also In re Welfare of Wilson, 91 Wn.2d at 491-92 ("Mere knowledge or physical presence at the scene of a crime neither constitutes a crime nor will it support a charge of aiding and abetting a crime."). The State must prove more than

---

[9] When interviewed, Zghair initially claimed his driver's license wasn't valid and he did not drive the Pontiac. Almost immediately thereafter, in the same interview, Zghair said, "Yeah I drive it."

Zghair's presence at the shooting; it must establish that Zghair had actual knowledge, or information which would lead a reasonable person in his situation to believe, that he was promoting or facilitating the shooting.

The State argues that "[t]here was ample circumstantial evidence of Zghair's knowledge and facilitation of a second-degree assault in that he drove to the secluded scene of the shooting, with a shotgun in his car, then immediately fled the scene . . . ." At closing argument, the State argued:

> And at that moment that is [Zghair] turning a white Pontiac down that dark, you can see how dark it is, there's no lights down D Street. It's excluded, it's quiet. And that is [Zghair] turning down what seems to be a somewhat abandoned road and inside his car it's [Ruiz Perez], very likely the guy in the red shirt. And the gun that would be used to kill [Ruiz Perez].
>
> [Zghair] at that moment is an accomplice to the murder of [Ruiz Perez]. [Zghair] at that moment whether he shot [Ruiz Perez] or not, facilitated the commission of [Ruiz Perez]'s shooting by his acts. Driving [Ruiz Perez] to this location of his death.

State v. Asaeli, 150 Wn. App. 543, 208 P.3d 1136 (2009), is instructive regarding what is sufficient evidence of the requisite knowledge to establish accomplice liability. There, following a gang shooting in a park, defendants Vaeilua and Williams were both convicted of felony murder in the second degree predicated on assault. Both challenged the sufficiency of the State's evidence to convict them as accomplices. Id. at 550, 568, 572.

Division Two of this court reversed Vaielua's conviction. Id. at 598.

> "[A]lthough there was evidence that Vaielua was present at the park, that he drove [co-defendant] Williams and others to the park, and that he was aware that some members of the group he was with were trying to locate [the victim] Fola, the evidence failed to show that Vaielua was present at the scene with more than mere knowledge of some potential interaction with Fola."

14

Id. at 568. Evidence showed that, at the scene of the crime, Vaielua spoke with people there and asked where "Blacc" was, referring to the victim by his street name. Id. at 569, 551. But there was no evidence about what was said during any conversation Vaielua had or overheard, nor any evidence that any of these conversations related to a plan to shoot or assault the victim. Id. at 569. Thus, the court reasoned that "no evidence, direct or indirect, establish[ed] that Vaielua was aware of any plan . . . to assault or shoot [the victim]." Id. at 568-69.

In contrast, in the same case, the court held that there was sufficient evidence to convict Williams as an accomplice. Williams approached the victim, who was still in the driver's seat, and challenged him to a fight.[10] Id. at 556-57. The victim leaned over and reached for something under the seat, and then reached for the glove box. Id. at 557. A witness testified that Williams stated the victim had a gun and tapped the person behind him, Asaeli, upon which gunfire erupted. Id. The court held that Williams acted in the course of and in the furtherance of or in immediate flight from an assault:

> [T]aken in the light most favorable to the State, the evidence was sufficient to allow the jury to find that Asaeli was standing ready to assist Williams; that Williams knew Asaeli was armed because Asaeli positioned himself near Williams in way that allowed him access to [the victim] Fola; that Williams turned to Asaeli and signaled to him with a tap when the situation escalated; and that, in response to Williams's tap, Asaeli immediately stepped in and shot Fola. The evidence was sufficient to allow the jury to conclude that the assault or attempted assault encompassed the entire incident, not just Williams's initial verbal challenge to Fola, and that the

---

[10] A witness testified that Williams said to the victim, "[T]his be Twix ... let's go heads-up," which she interpreted as an invitation to fight. Asaeli, 150 Wn. App. at 557.

shooting occurred during the course of the assault or attempted assault.[11]

Id. at 572.

Regarding whether Williams knew the shooter, Asaeli, was armed and was going to shoot the victim, or that the two of them were acting in concert, the evidence showed that Williams and Asaeli spoke before going to the park where the shooting occurred and arrived simultaneously at the park. Id. at 573. Several people in the group with whom they arrived called out asking for the victim. Id. Further, Williams approached the victim with the shooter and positioned himself close by, and Williams signaled to the shooter once the situation escalated, upon which the shooter, Asaeli, immediately stepped forward and shot the victim. Id. The court reasoned that this evidence was sufficient to support the jury's conclusion that Williams knew Asaeli was armed and prepared to shoot the victim despite the lack of direct evidence of such knowledge.[12] Id.

Here, at most, the evidence supports an inference that Zghair drove with the victim and another person, the unidentified man in the red jacket, to the scene of the shooting. However, like Vaielua in Asaeli, merely driving to the scene does not support an inference that Zghair was aware of a plan to assault

---

[11] Unlike in the present case, where the predicate crime was assault with a deadly weapon, in Asaeli, the jury instructions allowed the jury to convict Williams of felony murder if he assaulted or attempted to assault the victim. The court in that case held that the evidence was sufficient to allow the jury to conclude that Williams and the others who approached the victim attempted to assault him. Asaeli, 150 Wn. App. at 557.

[12] While the court held the State's evidence was sufficient to support Williams's conviction, it also held that the trial court erred by admitting gang association evidence and gang expert testimony that unfairly prejudiced him. Id. at 549. Therefore, the court reversed Williams's conviction and remanded for further proceedings. Id. at 598.

the victim. And, unlike Williams in <u>Asaeli</u>, where there was sufficient evidence that Williams challenged the victim to a fight, culminating in the shooting, and did so knowing Asaeli was armed and prepared to assist in that fight, here, while Zghair was with the unknown person in the red jacket in the car, there is no evidence that Zghair or the person in the red jacket was the shooter or that Zghair was aware of any plan that any person was armed and prepared to shoot Ruiz Perez.

The State also asserts that Zghair was aware of a plan to shoot Ruiz Perez because he drove to the scene "with a shotgun in his car."  But there was no evidence that Zghair was aware there was a shotgun in the Pontiac, much less of a plan to use it to shoot Ruiz Perez. While the evidence of birdshot and blood in the car supports the inference that Ruiz Perez was shot with a shotgun in or very close to the rear seat on the driver's side of the car, the police did not recover the shotgun used to commit the crime, and there is no evidence that Zghair possessed one. There was no evidence of the dimensions of the shotgun that killed Ruiz Perez or whether the shotgun that killed him was fired from within the car or from outside it.

As evidence that Zghair was "at least a knowing participant" in the shooting, the State also points to Zghair's actions after the shooting. Zghair counters that evidence from after the fact of the shooting, including flight evidence, is insufficient to establish his actual knowledge before and during the crime charged.

17

Here, it is true there is evidence that, Zghair was aware of the shooting after the fact. After he was stopped at the U.S./Canada border crossing with another person's license, Zghair was interviewed by two Auburn Police Department detectives. They told him they were investigating a murder that took place in his car, but they did not mention a shooting. Zghair nonetheless offered that "I can't use a gun. Um, I don't know how to use guns." In the same interview, Zghair referenced the victim's apparent nationality—"if you guys talkin' about a Mexican guy"—without the detectives having told him the victim's race, ethnicity, or nationality. Zghair's statements at most could lead to the inference that he had knowledge of the crime after it occurred. This is not sufficient to establish that Zghair had knowledge of a plan to shoot Ruiz Perez *before* the crime occurred, as is required to establish accomplice liability.

Moreover, evidence that a person has knowingly aided a criminal enterprise after the fact is insufficient to establish accomplice liability.[13] See Anderson, 63 Wn. App. at 261 (contrasting crime of rendering criminal assistance, which involves knowingly aiding a criminal enterprise after the fact). The State characterizes Zghair's after-the-fact conduct instead as flight evidence, which "is admissible as evidence of consciousness of guilt." State v. Slater, 197 Wn.2d 660, 669, 486 P.3d 873 (2021).[14] However, a court must not instruct the

---

[13] The State claims that because no one came to Ruiz Perez's aid and because Zghair's car left the scene six minutes after arriving, with Ruiz Perez's phone still in it, this evidence establishes a "getaway" from an intentional shooting, a "classic example of aiding and facilitating a crime." But this after-the-fact evidence cannot establish that Zghair had the requisite knowledge of a plan to commit a crime before the fact.

[14] Examples of flight evidence include fleeing the scene of the crime, travelling to a different state, evading arrest for a significant period of time, cleaning the murder weapon, failing to contact

jury that flight evidence is conclusive proof of guilt. Slater, 197 Wn.2d at 668

(citing Hickory v. United States, 160 U.S. 408, 421, 16 S. Ct. 327, 40 L. Ed. 474

(1896) ("The statement that no one who was conscious of innocence would

resort to concealment was substantially an instruction that all men who did so

were necessarily guilty, thus ignoring the fundamental truth, evolved from the

experience of mankind, that the innocent do often conceal through fear or other

emotion.")). Instead,

> the circumstance or inference of flight must be *substantial and real*.
> It *may not be speculative, conjectural, or fanciful*. In other words,
> the evidence or circumstances introduced and giving rise to the
> contention of flight must be *substantial and sufficient* to create
> a *reasonable and substantive inference* that the defendant's
> departure from the scene of difficulty was an instinctive or impulsive
> reaction to a consciousness of guilt or was a deliberate effort to
> evade arrest and prosecution. Pyramiding vague inference upon
> vague inference will not supplant the absence of basic facts or
> circumstances from which *the essential inference of an actual
> flight* must be drawn.

Slater, 197 Wn.2d at 668 (quoting State v. Bruton, 66 Wn.2d 111, 112-13, 401

P.2d 340 (1965)). Thus, even if flight evidence is admissible to show an inference

of consciousness of guilt, "it tends to be only marginally probative as to the

ultimate issue of guilt or innocence." Slater, 197 Wn.2d at 668 (quoting State v.

Freeburg, 105 Wn. App. 492, 498, 20 P.3d 984 (2001)).

Here, the evidence shows that, after the shooting, Zghair's car left the

scene of the crime with both Zghair's phone and Ruiz Perez's phone in it and that

---

police while claiming self-defense, and destroying clothing. Slater, 197 Wn.2d at 669-70 (collecting cases). Other types of flight evidence include resisting arrest, concealment, assumption of a false name, and related conduct if the conduct allows a reasonable inference of consciousness of guilt of the charged crime. State v. Freeburg, 105 Wn. App. 492, 497-98, 20 P.3d 984 (2001).

Ruiz Perez's phone was never found. Zghair's Pontiac was later doused with cologne, and someone tried to remove a distinctive sticker from its windshield. The same day police found his car, Zghair pawned his mobile phone. Thus, as the State argues, there is evidence from which a juror could infer that Zghair was the person driving the Pontiac who "fled the crime scene immediately" and then took further actions to alter or remove evidence, thereby demonstrating consciousness of guilt.

Also, after the shooting, Zghair tried to enter Canada the day after police searched his address of record, using false identification and having shaved off his facial hair. He was stopped at the border for using another person's license and had gone to a nearby gas station while awaiting further processing, and when he saw border agents approaching, he ran from them. These actions by Zghair also could support an inference of consciousness of guilt.

However, after-the-fact evidence of consciousness of guilt of an unspecified crime cannot overcome a lack of evidence of the elements of the charged crime. Even if flight evidence may provide an inference of consciousness of guilt, "[p]yramiding vague inference upon vague inference will not supplant the absence of basic facts or circumstances from which the essential inference of an actual flight must be drawn." Slater, 197 Wn.2d at 668 (quoting Bruton, 66 Wn.2d at 112-13). For example, leaving the scene of the crime could potentially suggest consciousness of a crime other than the charged crime, such as assisting in or engaging in the sale of drugs, or rendering criminal assistance, but Zghair was not charged with those crimes. Specifically, flight

evidence cannot substitute for evidence that Zghair acted with knowledge that he was promoting or facilitating the shooting. Yet two questions from the jury suggest that it engaged in speculation based on Zghair's after-the-fact conduct and improperly relied on this evidence to determine accomplice liability.[15]

First, the jury asked, "Regarding instruction #11, is an action of intent limited to actions leading up to the commitment of a crime? Or can aid be implied by actions occuring [sic] after a crime?" Instruction 11 states "A person acts with intent or intentionally when acting with the objective or purpose to accomplish a result that constitutes a crime." Second, the jury asked about instruction 14, which provided information about accomplice liability:[16] "Regarding instruction

---

[15] Courts review questions asked by juries when considering whether a jury properly followed the law as instructed. State v. Davenport, 100 Wn.2d 763-64, 675 P.2d 1213 (1984) (question from the jury was a "contrary showing" rebutting the presumption that a jury properly follows a court's instructions); State v. Whitaker, 6 Wn. App. 2d 1, 23, 429 P.3d 512 (2018) (jury question made it "clear from the record" that the jury considered a prosecutor's misstatement of the law during closing argument).

[16] Instruction 14 stated as follows:

A person is guilty of a crime if it is committed by the conduct of another person for which he or she is legally accountable. A person is legally accountable for the conduct of another person when he or she is an accomplice of such other person in the commission of the crime.
A person is an accomplice in the commission of a crime if, with knowledge that it will promote or facilitate the commission of the crime, he or she either:
(1) solicits, commands, encourages, or requests another person to commit the crime; or
(2) aids or agrees to aid another person in planning or committing the crime.
The word "aid" means *all* assistance whether given by words, acts, encouragement, support, or presence. A person who is present at the scene and ready to assist by his or her presence is aiding in the commission of the crime. However, more than mere presence and knowledge of the criminal activity of another must be shown to establish that a person present is an accomplice.
A person who is an accomplice in the commission of a crime is guilty of that crime whether present at the scene or not.

#14, does the withholding of information to detectives constitute aiding another person in planning or committing a crime?"

Both questions inquire about the same type of evidence: Zghair's after-the-fact conduct. But as the jury was instructed, accomplice liability is limited to actions that occur before or during the crime charged.[17] Anderson, 63 Wn. App. at 261; RCW 9A.08.020. The jury's questions point to the problem here: absent sufficient evidence, the jury would have to speculate that after-the-fact evidence, including flight evidence, could prove the crime charged.

The State contends that "[t]hough Zghair did not directly confess to the crime, any rational jury could have inferred that his evasiveness and dishonesty, combined with his knowledge of the crime, was evidence of his guilt." A reasonable juror could infer that Zghair drove his Pontiac with Ruiz Perez in it to the scene of the crime. There is, however, no evidence from which to infer that he was the person who shot Ruiz Perez. With all the inferences taken in the State's favor, no rational juror could conclude beyond a reasonable doubt that a shotgun was inside the Pontiac, that Zghair knew a shotgun was in his car when he drove Ruiz Perez to the scene, or that Zghair knew of a plan to shoot Ruiz Perez. Nor could a rational juror conclude beyond a reasonable doubt that Zghair had information that would lead a reasonable person in his situation to believe he was assisting in the planning or commission of the crime charged.

---

[17] Neither party disputes the trial court's jury instructions or its answer to the jury's questions.

We conclude that the evidence is not sufficient to support Zghair's conviction for second degree felony murder. We reverse and remand to the trial court to vacate Zghair's conviction and dismiss the charge against him with prejudice.

_Chung, J._

WE CONCUR:

_Coburn, J._          _Hazelrigg, ACJ_